# NOLES *vs.* THE STATE.

1. Where the accused may be convicted, under the indictment, of murder in the first degree, he is entitled to the number of peremptory challenges allowed in prosecutions for that offence ; and it is, therefore, no objection to the form of indictment prescribed by the Code (p. 698), that it does not distinguish between the different degrees of murder.

2. The fifth article of the amendments to the constitution of the United States, which declares that "no person shall be held to answer for a capital or otherwise infamous crime, unless on presentment or indictment of a grand jury," does not restrict the States, in the prosecution of capital or infamous crimes, to the common-law indictments. Those amendments were demanded by the States as safe-guards against encroachments on the part of the Federal Government, and were not designed to restrict their own powers.

3. The tenth and twelfth sections of the first article of our State constitution do not restrict the powers of the Legislature to enact laws defining offences and their punishment, and prescribing the forms of indictments suited to them, as well as the mode of trying them. If the form of indictment prescribed by the statute contains such an accusation, at the suit of the State, found to be true by the oaths of a grand jury, as furnishes to the accused reasonable information of what he is called on to answer, by setting forth the constituent elements of the offence, it will be sufficient, although it omits many averments which, at common law, were necessary to the validity of an indictment.

4. It was competent for the Legislature, by statute, to dispense with the averment, in an indictment for murder, that the offence was committed within the body of the county in which the indictment was found, and to require that fact to be shown by the evidence.

5. The caption of an indictment, showing when, where, and by whom the court was held, and who were elected and sworn as grand jurors, may be looked to, in aid of the indictment, as a part of the record.

6. A verdict *finding the prisoner guilty of murder in the first degree, and sentencing him to be hung*, is sufficient to authorize a judgment of conviction and sentence of death.

7. The date of the sentence and day of execution may be expressed in figures, instead of letters.

8. A justice of the peace has authority, in cases of emergency, to appoint a special constable (Code, § 712) ; and he must himself judge of such emergency.

9. A warrant, issued by a justice of the peace, if it shows on its face that the justice had no authority to issue it, is no protection to the officer executing it, but he may be treated as a trespasser.

10. An affidavit, by a married woman, that " she *is afraid* her husband will beat, wound, maim, or kill her, or do her some bodily hurt," is not sufficient to authorize the arrest of the husband (Code, §§ 3340, 3341) ; and if the warrant of the justice appears on its face to be predicated on such an affidavit, it is void, and furnishes no protection to the officer executing it.

ERROR to the Circuit Court of Dallas.

Tried before the Hon. NAT. COOK.

JOSEPH NOLES, the plaintiff in error, was indicted in the Circuit Court of Dallas, at its Spring term, 1853, for the murder of George Sharp. The indictment was in the form prescribed by the Code, on page 698. The prisoner demurred to the indictment, but his demurrer was overruled, and he then pleaded not guilty. The jury returned a verdict, saying, "they find the defendant guilty of murder in the first degree, and sentence him to be hung." The prisoner moved to set aside this verdict, but his motion was overruled; and he then moved in arrest of judgment, which motion was also overruled.

From the bill of exceptions, which was taken by the prisoner, it appears, that his wife made an affidavit before a justice of the peace, for the purpose of compelling him to keep the peace; that the said justice thereupon issued his warrant for the arrest of the prisoner, reciting therein, as the predicate of its issue, that Mary Noles, wife of Joseph Noles, had made affidavit before him, " that she is afraid that her husband will beat, wound, maim, or kill her, or do her some bodily hurt, and has therefore prayed surety of the peace against him," and appointed the deceased a special constable to execute it; that the prisoner, before the appointment of the special constable, had gone to the office of the justice, and demanded an investigation of the charge, which the justice had declined, saying that he could not hear the cause until the prisoner was in custody; that the prisoner had not left the town when the special constable was appointed, but there was no proof whether or not he knew of the appointment; that soon after the prisoner started out of town, in the direction of his home, the deceased started after him, and overtook him in the edge of the village, where the prisoner was engaged in an altercation with one Perry. The evidence was conflicting as to what occurred at this interview, but there was no evidence that the deceased, at this time, said anything to Noles about the warrant. About two o'clock, on the afternoon of the same day, the deceased, in company with three others, went to the prisoner's house, for the purpose of arresting him under the warrant, which the deceased had in his possession; but no arrest was then effected. Late in the after-

noon of the same day, the deceased again returned, in company with seven or eight other persons, to arrest the prisoner; the deceased carrying a gun with him. On approaching the prisoner's house, he came out to meet them, with a gun in his hands; and in the interview which then took place, he shot the deceased, killing him immediately. It is not deemed necessary to state, with particularity, the evidence as to what occurred on this occasion, as no question is here raised on it. It was not proved that the prisoner lived in the beat of the justice who issued the warrant, but his residence was in the county.

The court charged the jury, that the deceased had the right, under the warrant, to arrest the prisoner any where in the county; to which charge the prisoner excepted.

The prisoner asked the court to charge, that the appointment of the deceased as a special constable, unless there was an emergency for the appointment, was void, and he had no right to attempt to arrest the prisoner under it; which charge the court gave, but with this qualification: "that if there was no officer in the beat or neighborhood, that showed a sufficient emergency, or, at all events, the magistrate making the appointment must judge of the emergency." The prisoner excepted to the refusal to give the charge without the qualification, and also to the qualification given.

The prisoner also asked the court to charge, "that, if the warrant did not recite the substance of the complaint, it was a void process, and gave no right to arrest the prisoner; which charge the court gave, but stated that sufficient did appear on the face of the warrant to authorize an arrest;" and the prisoner excepted to the charge as given and as refused.

The prisoner also asked the court to charge, "that if an officer, in attempting to execute a process, does what the law does not authorize him to do, he is a trespasser, and the person charged is not bound to regard him as an officer, and may resist him; which charge the court refused to give, on the ground that it was abstract;" and the prisoner excepted to the refusal.

Geo. W. Gayle, with whom was Thomas Williams, for the plaintiff in error:

As to the Indictment.

There are various provisions of the Code of Alabama, which

bear more or less on the case. The statute creating the offence of murder in the first degree, of which the prisoner was convicted, is in the words and figures following, to wit: "§3080. Every homicide perpetrated by poison, lying in wait, or by any other kind of wilful, deliberate, malicious, and premeditated killing, or which is committed in the perpetration of, or the attempt to perpetrate, any arson, rape, robbery or burglary, is murder in the first degree; so, also, every homicide perpetrated from a premeditated design, unlawfully and maliciously to effect the death of any human being, other than him who is killed, or perpetrate by any act greatly dangerous to the lives of others, and evidencing a depraved mind, regardless of human life, although without any preconceived purpose to deprive of life any particular individual ; any person guilty of murder in the first degree, on conviction, must *suffer death*, or imprisonment in the penitentiary for life, at the discretion of the jury trying the same." The statute creating murder in the second degree is in the words and figures following, to-wit : "§ 3081. Every homicide committed under such circumstances as constituted murder at the common law, and is not embraced by murder in the first degree, as defined in the preceding section, is murder in the second degree ; and on conviction the offender must be imprisoned in the penitentiary for not less than ten years."— The statute in relation to the action of the jury upon the two above sections, is in the words and figures following, to-wit : "§3082. Upon any indictment for murder, the jury, finding the offender guilty, must ascertain by their verdict if it was murder in the first or second degree," &c. The solicitors of the State are not bound, in drawing indictments, to pursue the forms laid down in the Code, but they are required to make their indictments applicable to the offence charged. The statute on this subject is as follows : "§3503. The manner of stating the act constituting the offence, as set forth in the forms given in the appendix to the Code, is sufficient in all cases where the forms there given are applicable." The second branch of §3501 directs what an indictment shall contain, in the following words and figures : "2. A statement of the facts constituting the offence, in ordinary and concise language, without prolixity or repetition, and in such a manner as to enable a person of common understanding to know what is intended," &c. Another

important section of the Code which may bear on this case; is as follows :　" §3504. All indictments for offences designated in this Code, which are offences at the common law, are good, if the offence is charged or described as at common law," &c. And, another in the following language, to wit :　" §3515: The act or omission charged as the offence must be stated with that degree of certainty as to enable the court to pronounce judgment upon a conviction, according to the right of the case."

1. Having presented the foregoing provisions of our Code, I will discuss the invalidity of the indictment, without reference to the constitutional objection to it, by three propositions : 1. Indictments for murder should be drawn upon the section of the Code defining murder in the first degree ; 2. They should be drawn separately for murder in the first and second degree, as separately for murder and manslaughter at common law ; 3. They should be drawn according to the forms of the common law.　The indictment in question is not upon any statute, and follows no common law form; and I assume these propositions to show that if either can be maintained the indictment is invalid.　Then, 1. Indictments for murder should be drawn upon the section of the Code defining murder in the first degree, including the terms " wilful, deliberate, malicious and premeditated"; because, 1, they would cover the inferior offence of murder in the second degree, as an indictment at common law covers and includes the offence of manslaughter ; 2, if not so drawn, the jury would have no right to determine whether the prisoner was guilty of murder in the first, or second degree, as required by §3082 cited, because the indictment must support the verdict ; 3, if not so drawn, the offence will not be so described as to enable the court to pronounce judgment upon conviction, as required by §3515, cited ; 4, if not so drawn, it will not be "applicable," as required by §3503, cited ; 5, if not so drawn, it will not be a statement of the facts constituting the offence, and in such a manner as to enable a person of common understanding to know what is intended," as required by §3501, br. 2.　2. They should be drawn separately for murder in the first and second degree, as the grand jury find the offence to be, because, in addition to the foregoing reasons, 1st, the judge cannot tell, at the opening of a cause, whether a prisoner is entitled to twenty-one or fifteen peremptory challenges.　Murder

in the first degree is a capital offence, and one indicted for it is entitled to twenty-one peremptory challenges; murder in the second degree is punished, alone, by imprisonment in the penitentiary for not less than ten years.—As to challenges, see Code, §3581. 3. They should be drawn according to the forms of the common law, as authorized by §3504 of our Code.

2. Having disposed of the indictment without reference to the constitutional objections, I will now show that, in its present form, it violates the constitution of the United States, and of the State of Alabama. It violates these constitutions in not being drawn after the common law forms. The fifth article of amendments to the constitution of the United States, as far as applicable, reads as follows: " No person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a grand jury," &c. The tenth section of the bill of rights in the constitution of Alabama, as far as applicable, reads as follows: "In all criminal prosecutions, the accused has a right to be heard by himself and counsel; to demand the nature and cause of the accusation, and have a copy thereof; * * * and, in all criminal prosecutions, by indictment, or information, a speedy public trial by an impartial jury of the county or district in which the offence shall have been committed," &c. The twelfth section of the same bill of rights, as far as applicable, reads as follows: "No person shall, for an indictable offence, be proceeded against criminally, by information," &c. One or more of these provisions is violated in not using the common law form; because, first, the word "indictment," used in them, refers to common law indictments, which, at the time of their adoption, had a technical form, and to which the wise men who framed them referred. What was an indictment then? in 1798, when the fifth article of the amendments to the constitution of the United States was adopted, and in 1819, when the constitution of Alabama was formed? It was "a bill or declaration of complaint drawn up in form of law, exhibited for some offence criminal or penal, and preferred to a grand jury."—3 Jacob's Law Dic. 401. The *lex scripta* is to be construed, in one respect, by the meaning of the language employed at the time of its enactment (Blakeney v. Blakeney, 6 Por. 109; Favers v. Glass, 22 Ala. 621; Foster v. Blount, 18 Ala. 687), and "the best way to expound a stat-

ute is to consider what answer the law-givers would probably have given to the question made, if proposed to them.—6 Jacob's Law Dic. 122. Suppose the two bodies of wise men who made the constitutions referred to, were assembled and asked, "when you used the word 'indictment' in your constitutions, what did you mean by it?" would not their answer be, "we meant an indictment according to the forms of the common law ?"— But our own court has settled this question, so far as an adjudication in a civil cause can settle it. It is said that where the term "plea" is used in a statute, without any accompanying definition, it means a common law plea.—Mauldin v. Br. Bank at Mobile, 2 Ala. 505. Second, the common law form should be pursued, in order that the prisoner may know "the nature and cause of the accusation against him."—Bill of Rights § 10, *supra*; Murphy v. The State, 2 Cush. (Mi.) 590. Can the indictment in this case furnish the prisoner with "the nature and cause of the accusation ?" There are, with us, two kinds of murder, differently punished, and the indictment is not upon either statute creating these offences, nor according to the forms of the common law. Could the prisoner, from the indictment, tell whether he was to be tried for an offence which would put him in the penitentiary for life or hang him, or for an offence punishable by imprisonment alone in the penitentiary for not less than ten years ? Can the court tell from an inspection of that paper ? The case of Murphy v. The State, cited above, was for the simple misdemeanor of trading with slaves ; and for the same reason the Supreme Court of Mississippi declared an act of the Legislature of that State unconstitutional. If, for the reasons given, the indictment should be according to the common law form, let us see if the one in question is of such a character, and in what it differs. On comparison, it will be found defective in these particulars : first, it don't show that the grand jury were sworn ; second, it don't state the offence was committed "with force and arms"; third, it don't state the offence was committed "in the county"; fourth, it don't use the words "feloniously or wilfully"; fifth, it don't show that the deceased "died of the wound" ; sixth, it don't show he " died in the county." Then the indictment is invalid, and should have been quashed on demurrer, or motion in arrest of judgment.

3. But, if a departure from the common law form is allowed, then the indictment is defective (besides other reasons already given), in not showing, first, that the grand jury were sworn; second, that the offence was committed in the county in which he was tried; third, that the prisoner is a white man or negro. First, the grand jury are required by law to be sworn.— Code 462,–3, § 3. The indictment should show it, that the prisoner may know "the nature and cause of the accusation" against him, which he can alone get from the indictment. If it does not show they were sworn, he has no right to treat it as evidence of "the nature and cause of the accusation."—State v. Fields, Peck's (Tenn.) R. 140; State v. Hunter, ib. 166. Second, the offence should be shown by the indictment to have been commited in the county. True, the 3514 § of the Code declares it unnecessary. That section reads : "It is not necessary for the indictment to allege where the offence was committed, but the proof must show it to have been within the jurisdiction of the county in which the indictment is preferred." But this statute is supposed to be unconstitutional, and to violate the tenth section of the bill of rights, in two respects : first, the prisoner has a right to demand "the nature and cause of the accusation against him, and have a copy thereof." When furnished with a copy of the indictment, he is not informed by it whether he has killed a man in Mississippi, Georgia, or Alabama, and does not know how to prepare his defence, or where to send for witnesses. And every person is presumed to be innocent, until his guilt is made to appear.—Murphy v. The State, 2 Cush. 590. Second, the prisoner has a right to "a speedy public trial by an impartial jury of the county or district in which the offence shalll have been committed." If a prisoner has to be put on his trial as the Code requires, and wait for proof of jurisdiction, he may never have "a speedy trial." Suppose a grand jury in Dallas were to find a bill for a homicide committed in Madison, and this was ascertained after the trial was commenced "by proof"; the prisoner, as a consequence, after much expense, would be sent to Madison. Would this delay be giving him "a speedy trial"? Besides, the discovery of a want of jurisdiction, after the jury were empannelled, and cause submitted, would amount to the prisoner's acquittal.—Ned v. State, 7 Port. 187. Third, the indictment should show that

the prisoner was a white man or slave. Upon this subject our statutes are perfectly silent. They do not require an indictment against a slave to state that he is a slave. Now, suppose every indictment for murder follows the form of the one in this case (and it is the only form found in the Code), how is the court to know whether the prisoner is a white man or slave, so as to try him by the law applicable to his condition? It is impossible that this can be done. First, the court cannot say whether the jury shall consist of two-thirds slave-holders; second, the court cannot determine the number of challenges; a white man being entitled to 21 and 15, and a slave to 12 (Code § 3319); third, the jury cannot tell whether to find the prisoner guilty of murder in the first or second degree, and if the first, whether to hang him or put him in the penitentiary for life; fourth, the judge cannot tell whether to sentence him to be hung, or send him to the penitentiary. Neither the judge nor the jury can determine this from an inspection of the prisoner, but from the indictment alone.

4. The indictment does not support the verdict of the jury. The form of a verdict is, " We, the jury, find the prisoner guilty in manner and form as charged in the indictment. Now, first, this indictment not being drawn upon the provision of the Code creating murder in the first degree, nor according to the forms of the common law, cannot support the verdict, because it does not charge the prisoner with murder in the first degree; second, it is uncertain, and not such an indictment as the statutes cited require (Code, § § 3515 ; 3501, br. 2); third, there being murder in the first and second degree, " the statement of the facts are not in such a manner as to enable one of common understanding to know what is intended."—Code § 3501, br. 2. The forms laid down by the Code are good only when "applicable."—*Ib.* § 3503.

As to the Verdict and Judgment.

The verdict rendered in this case is in the following words : " We, the jury, find the prisoner guilty of murder in the first degree, and sentence him to be hung." This verdict was never changed, or put in form, but stands in this language upon the minutes of the court.

1. No judgment can be rendered on this verdict. Suppose the jury had said " we find the prisoner guilty of murder in the

first degree," and said no more; no judgment could be rendered, because they would not have exercised their discretion as to hanging, or imprisonment for life. Or, suppose they had found the same verdict, and added: "we sentence him to be whipped"; no judgment could be rendered, because the same discretion of the jury had not been exercised, The addition to the verdict in this case,—"we sentence him to be hung,"—is as ridiculous as though the jury had said, "we sentence him to be whipped." The addition to the finding is unwarranted by law, and leaves the discretion of the jury unexercised. The verdict should have been in the language of the statute, thus: "We, the jury, find the prisoner guilty of murder in the first degree, and further find that he must suffer death"; leaving it to the court to direct the manner of his death according to law.

2. The judgment of the court must follow the verdict, and it is for this reason that verdicts are allowed to be put in form.— See 2 Hawk. P. C. 662, § 9, n. 2. The court can, therefore, only sentence the prisoner to be hung, but cannot say how, or in what manner, or it departs from the verdict, and presumes what the jury intended. In criminal cases nothing can be taken by intendment.—Wharton's Am. Cr. L. 92. If the judgment merely follows the verdict, the judgment never can be executed, because the sheriff cannot know how to hang the prisoner,— whether by the arms, legs, neck, or other important member.

3. The jury, by their verdict, usurped the powers of the court, as to the right of judgment, or sentence. It is the court's duty to sentence prisoners, and not the jury.—Code, § 3638.

4. But there are two sentences in the record, materially differing—the sentence of the jury, and the sentence of the court. The first is that the prisoner be hung, fixing no time for the execution; the other that he be hung by the neck, on a certain day. By which sentence must the sheriff be governed? If this case is not reversed, it may be necessary to apply for a writ of prohibition to stop the execution of the sentence by the judge; for I insist that the sentence of the jury being first should be followed, and, regarding the humanity of the law, the prisoner be hung by the legs for the usual length of time; the sentence of the jury being silent as to the mode and manner of hanging.

44

5. The judgment or sentence of the court is fatally defective in describing the day of the sentence, and the day of the execution. The first was on the 31st May, 1854, and the latter is to be, perhaps, on tne 11th August of the same year. The fatal defect in it is, in putting these periods in figures, and not in letters. In the case of The State v. Raiford, 7 Porter 101, Judge Ormond admits this to be the common law, and overruling it, says : " At all events it would savor of unnecessary refinement to sustain such an objection now." Now, what right had the Supreme Court of Alabama, in Judge Ormond's day, or through Judge Ormond, to alter or change the common law ? The Legislature is the law-making power, and not the Supreme Court ; and the Legislature, in this respect, has not altered the common law, and it is as much in force among us as our statutes are. Upon this subject, the common law says : "Figures are numerals. They are either Roman, made with letters of the alphabet, for example, MDCCLXXVI ; or they are Arabic, as follows, 1776. Roman figures may be used in contracts and law proceedings, and they will be held valid ; but Arabic figures, probably owing to the ease with which they may be counterfeited, have been held not to be sufficient to express the sum due on a contract, and indictments have been set aside because the day or year were expressed in figures.— Bouvier's L. D. vol. 1, 409, Tit. " Figures," and authorities there cited. If it is a defect in an indictment to give dates in figures, it is more so to give them in that way in the solemn sentence of death.

AS TO THE BILL OF EXCEPTONS.

1. The court below erred in charging that the deceased had a right to arrest the prisoner out of the magistrate's beat in which he was appointed, and any where in the county. The warrant was for no offence, but for an expected misdemeanor.— Roscoe's Cr. Ev. (2 Eng. ed.) top page 695. One constable is elected for each precinct, like a sheriff for a county.—Code § 715. A constable vacates his office by removal from the beat, and is liable to a penalty for acting after removal.— Code § 720. The same rules which govern a sheriff as to his county, govern a constable in his beat, or precinct.—Pixley v. Butts, 2 Cow. 421. A warrant for a misdemeanor and a civil process stand on the same footing, and a sheriff cannot go

out of his county to levy civil process.—Allen on Sh'ffs, 14; 3 U. S. D. 440, § 315; 2 Sup. U. S. D. 767, § 13.

2. The court erred in refusing, without qualification, to give the charge asked, "that unless there was an emergency to appoint the deceased a special constable, his appointment was void, and he had no right to arrest Noles under it."—Code § 712, br. 3; Clay's Dig. 364, §§ 6, 8. A peace warrant can be executed by any executive officer in the county.—Code § 3385.

3. The court erred in the qualification of the last above charge, "that if there was no officer in the beat or neighborhood, that showed a sufficient emergency; or, that at all events the magistrate making the appointment must judge of the emergency." 1. When there is no officer in the beat, the magistrate may appoint one, and he is a different officer from one appointed in cases of emergency.—Clay's Digest 364, §§ 6, 8. 2. There being no constable in the beat created no emergency, because there had been none there for years; and, besides, the magistrate had power to appoint a regular constable.—Clay's Digest 364, §§ 6, 8. And there were constables in adjoining beats, and a sheriff and deputies in the county. 3. There was no emergency, because the prisoner went before the magistrate, and demanded an investigation. 4. What does emergency mean? In its common acceptation, it means "pressing necessity." Was there this necessity to have the prisoner arrested, when he was within the jurisdiction of the court, and demanded an investigation?

4. The court erred in refusing to charge "that if the warrant did not recite the substance of the complaint, it was a void process, and gave no authority to arrest Noles." The warrant did not recite the substance of the complaint, if the complaint is a legal one. It simply says, affiant "is afraid that her husband, Joseph Noles, will beat, wound, maim, or kill her, or will do her some bodily hurt." The magistrate had no right to issue the warrant, unless affiant had sworn that Noles had threatened her, or was about to commit an offence on her person. Neither oath she took.—Code, §§ 3340, 3341; Clay's Dig. 446, § 4. If the warrant recites the complaint, then the magistrate had no right to issue it, because the complaint, as recited, is unauthorized by law. Being "afraid" of personal violence,

does not, alone, justify binding one over to the peace. The process must be legal to justify an officer, and its legality depends on its conformity to law.—Roscoe's Cr. Ev. (2 Eng. ed.) 697. And it must be from a court having jurisdiction.

5. The court erred in the qualification given to the next above charge asked, " that sufficient appeared on the face of the warrant to authorize an arrest." Compare the warrant with the law, and it will be found there is nothing in it to justify an arrest, much less the issuing of the warrant.—Clay's Digest 446, § 4; Code, § 3341.

6. The court erred in refusing to charge, as asked, " that if an officer, in attempting to execute a process, does what the law does not authorize him to do, he is a trespasser, and the prisoner is not bound to regard him as an officer, and may resist him." This charge the court refused to give, because it was said to be abstract. It was not abstract: 1. Because the warrant was for less than a misdemeanor, and the officer and his *posse* had no right to advance when forbidden, and to attempt to kill the prisoner on resistance.—Roscoe's Cr. Ev. (2 Eng. ed.) top page 702 ; Middleton v. Holmes, 3 Porter 424. 2. Because the special officer never made known his official character to the prisoner.—Roscoe's Cr. Ev. (2 Eng. ed.) top page 701, 702.

P. T. SAYRE, for the Attorney General, with whom was J. H. CAMPBELL, *contra :*

Under the constitutions of this State and the United States it is contended, four things must exist, to render any criminal trial legal, viz., 1, an indictment; 2, the offence must have been ascertained by law ; 3, the accusation must be in the form prescribed by law; 4, the accused must be informed of the nature and cause of his accusation. It is contended that the term indictment, signifies a " common law" indictment.— What, then, is a common law indictment? An indictment, says Archbold, " is an accusation at the suit of the crown, found to be true by the oaths of a grand jury."—1 Archbold's Cr. Plead. 632; 1 Chitty's Cr. Law 168 ; 4 Black. Com. 302 ; Code § 3497.

What allegations are necessary, to give it the character of an accusation? 1. It must be upon the oath of a grand jury.

2. It must contain a certain description of the alleged crime and a statement of the facts which constitute it, lest the grand jury should find a bill for one offence, and the defendant be tried for another (1 Chitty's Cr. Law 169) ; and, in order also that the accused may know what crime he is called upon to answer; 3rd, the offence must be so charged, that every one may understand it, alleging all the essential requisites of the offence.— 1 Chitty's Cr. Law 172. 4. The offence must be positively charged, and be in English.

These are the chief and grand requisites of the common law accusation. The indictment in this case, will be found to contain them all. 1. It states the court, and county, and time of finding the indictment. 2. It appears to be the accusation of a grand jury of Dallas. 3. It alleges that " Joseph Noles, on the 14th of February, 1853, unlawfully, and with malice aforethought, killed George T. Sharp, by shooting him with a gun, against the peace and dignity of the State of Alabama." Murder is the unlawful killing of any one, with malice aforethought, either express or implied. From this indictment, you could frame the above definition of murder. The accused is advised by it, that a grand jury of Dallas County has charged him with an offence, and that the offence is the murder of Geo. T. Sharp. There is no danger, upon this indictment, that the defendant would be tried for some other offence, or that he would not know what he was called on to answer. This indictment, therefore, contains all the great features of a common law indictment.

But it is objected, that the word indictment means a common law indictment, in every particular ; and that if this indictment does not contain every allegation, that was usual in common law indictments, at the time of the adoption of the constitution, it is no indictment. This cannot be the case, until it is shown, that there were, at common law, fixed forms, which could not be varied or changed. 1. There were no forms of indictment established by any tribunal known to the common law. 2. The forms which were used in England, were framed by different individuals, and were of no authority, except when sustained by the decisions of the courts. 3. The common law only required, that the accusation should be based upon the principles above stated. The forms of indictment in England have been contin-

ually undergoing changes, both in language and allegations.—
In England, New York and Massachusetts, forms of indictments
have been changed.—Wharton's Cr. Law 612.

The particular objections to the indictments cannot be sus-
tained. The minutes of the court sufficiently show that the
grand jury was sworn (State v. Murphy, 9 Port. 487) ; and it
is not necessary that their names, or that they were sworn,
should appear in the body of the indictment. The term "grand
jury" is technical, and " *ex vi termini*" implies the proper
qualifications.

The words " force and arms" are no part of the offence for
which the defendant was indicted. They are mere words of
formality, that could by no possibility have added anything to
the force of the indictment. New York, Massachusetts and
Alabama have declared them unnecessary.—Wharton's Cr. Law
62; Code, § 3501.

There is no reason why the name of the county in which the
offence was committed should be stated ; it forms no part of
the offence of murder—an offence might be committed in one
county and punished in another, but for the constitution.—1
Chitty's Cr. Law 183. The words " feloniously and wilfully"
are not necessary to advise the party that he is charged with.
murder. They are not even used, in the elementary works, as
descriptive of the offence. "Unlawfully and with malice afore-
thought," are certainly terms of as strong descriptive power as
" feloniously and wilfully." They are mere words, intended to
be only description, and constitute no more elements of the
offence, than do the words " force and arms," and " contrary
to the statute." It might just as well be contended, that in
indictments, the spelling of Henry VIII must be used, and
that there could be no court, unless the judges wore wigs and
gowns.—Barb. Cr. Law 333.

If the constitution of the United States, by the word indict-
ment, means a common law indictment, in every word and letter,
it is certainly at war with the provisions of the constitution of
this State. Instead of " indictment," our constitution uses the
words " according to the forms which the same has prescribed."
From this clause, it is clearly inferable, that the State has the
power to pass laws prescribing forms, by which criminal prose-
cutions shall be conducted. But, to put this beyond all ques-

tion, the 19th section of the 6th article of the constitution of Alabama, declares, "that it shall be the duty of the General Assembly, as soon as circumstances will permit, to form a penal code." The 20th section of the same article prescribes "that within five years after the adoption of the constitution, the body of our laws, civil and criminal, shall be revised, digested," &c. This has been done ; and this party has been indicted according to the forms prescribed by law.

But even if the indictment is not a good common law indictment, it is good because the laws of Alabama say it is good.— The articles of the constitution of the United States, relied upon, have no applicability to the administration of the criminal law of the State ; they refer only to the administration of the criminal laws of the United States. It would be a strange anomaly, if the State had the right to define and create offences, to change, modify and increase punishments, and yet have no power to change the particular forms in which accusations should be made. Upon that principle, no indictment for a statutory offence would be good, unless it conformed to the common law form, or unless the offence existed at common law. But the Legislature has the right to change the common law, and to change the statute laws of the State. And it is a general rule of law, that the common law shall only remain in force, until it is altered or repealed by the law-making power. At the time of the making of our constitution, if the common law proceedings were in existence, then they were the forms to be observed in criminal prosecutions. It would be strange, indeed, if for all time to come, no other forms of indictment should be good except those which have been furnished by the common law. The proposition that any sovereignty has the power of establishing its own system of laws, seems to be too plain for argument, and the right has been constantly exercised. To say that any other power can supervise or establish the internal laws of a State, would be a direct violation of its sovereignty.— The people of Alabama, in their sovereign capacity, could abolish trial by jury, and the grand jury itself ; and in this State, the Legislature has passed laws for the punishment of crimes, without the interposition of a grand jury.—Code §§ 3316, 3324. The "forms of law" required by our constitution have been followed. A grand jury has presented a sworn accusation. The

accused has been tried by a competent court, and convicted by a petit jury.

The Code provides, that the grand jury shall not determine the degree of murder of which the party is accused; that duty is imposed upon the jury trying the offender (Code § 3082); and such has been the practice in this State and Tennessee.—16 Ala. 781.

The verdict is a substantial compliance with the law. The word "hung" is a technical term, and, when used in the connection presented in the record, means suffer death. It is sufficient if the jury find all the essential requisites of the charge.—1 Chit. Crim. Law 644. The court will not disturb a verdict on account of any defect in its form, provided the intention of the jury is unequivocal and evident.—1 Morris (Iowa) 52; ib. 18. And the verdict may be amended, even in a criminal case (1 Chit. Crim. Law 646; 1 Morris 13); and upon appeal.—18 Vermont 180.

CHILTON, C. J.—The indictment in this case pursues the form prescribed by section 3080 of the Code, and reads as follows :

" THE STATE OF ALABAMA, ⎰
            Dallas County.        ⎱   The grand jury of said Dallas County charge, that on the fourteenth day of February, 1853, Joseph Noles, unlawfully, and with malice aforethought, killed George T. Sharp, by shooting him with a gun, against the peace and dignity of the State of Alabama.
            (Signed)                        J. A. STALLWORTH,
                  Solicitor for the Second Judicial Circuit of Ala."

Many objections are made to it, which we shall notice in the order in which they are presented by the prisoner's counsel.

1. As to the several objections, that the indictment does not distinguish between murder in the first and second degrees, as defined by the Code, and does not, according to the rules of the common law, sufficiently set forth the facts and circumstances of the alleged homicide to make it good as an indictment for murder in the first degree, we need only say, that the form pursued being that prescribed by the Code, the objections cannot be valid, if the Legislature had power to enact that the form should be a good indictment. The Code must be

regarded as a system or body of laws, and must be so construed that its provisions may harmonize with each other, unless they are clearly repugnant. There is no repugnance here. Form No. 2, on page 698, is prescribed as the indictment for the offence defined by section 3502, and the jury are to determine whether the proof makes the offence murder in the first or second degree, as they determined, at the common law, whether the offence was murder or manslaughter. As the greater includes the less offence, there is certainly nothing anomalous in finding a prisoner guilty of the less, upon an indictment for the greater. The objection that the party is not advised as to the number of peremptory challenges to which he is entitled, cannot properly be urged, for the reason that, in every case where he may be convicted of the higher offence, he is entitled to the number of challenges allowed in prosecutions for that offence.—*Ex parte* McCrary, 22 Ala. 65.

If the form of the indictment specially pointed out by the Code to be pursued in prosecutions of this kind, did not, in every particular, correspond with the general law defining the nature, and pointing out the requisites generally, of indictments, the well established rule of construction, which requires that even as to pensl statutes we should carry out the obvious intent of the Legislature, to be gathered from the words of the law (Smith's Com. on St. pp. 834 to 878), would require us to exempt the particular form without the influence of the general statute, as a legislative exception; otherwise the provisions would be suicidal. But we are satisfied that no such repugnance exists in the case before us; on the contrary, the form pursued is in harmony with the other provisions of the Code.

We come now to consider the sufficiency of the indictment with reference to the Federal and State constitutions. Had the Legislature the power to make this a valid indictment, and to require the jury to find by their verdict whether the offence was murder in the first or second degree; and within certain prescribed limits, to exercise a discretion as to the penalty to be inflicted on conviction?

It is insisted by counsel, that the fifth article of the amendments to the constitution of the United States, which provides that " no person shall be held to answer for a capital or otherwise infamous crime, unless on presentment or indictment of a

grand jury," &c., is an inhibition upon the States, restricting them in the prosecution of capital or infamous offences to the *common law* indictment; and that, inasmuch as the indictment before us is manifestly defective as a common law indictment, it cannot be supported, and the statute prescribing it is unconstitutional and void. It is further contended, that it is violative of the tenth and twelfth sections of the bill of rights of this State; the first declaring, that " in all criminal prosecutions, the accused has a right to be heard by himself and counsel, to demand the nature and cause of the accusation, and have a copy thereof," &c.; and further, that " in all criminal prosecutions, by indictment or information, a speedy public trial by an impartial jury of the county or district in which the offence shall have been committed," &c.; and the twelfth section providing, that " no person shall, for any indictable offence, be proceeded against criminally by information."

It is needless to inquire whether the provisions of the Code sanctioning this indictment may consist with the 5th article of the amendments to the Federal constitution; for the reason, that these amendments were never designed to operate upon the States, as restrictive of their powers, but were demanded by the States as safe-guards against encroachments on the part of the Federal Government. The history of the country informs us, that the resolutions proposing these amendments were offered by Mr. Madison, to meet objections made by some of the State conventions, to the unrestricted powers conferred upon the General Government by the constitution as it then stood, in regard to certain subjects-matter of legislation. The preamble of the resolutions, as they passed Congress, may serve to strengthen this conclusion. It declares : " The conventions of a number of the States having, at the time of their adopting the constitution, expressed a desire, in order to prevent misconstruction or abuse of its powers, that further declaratory and restrictive clauses should be added; and, as extending the grounds of public confidence in the government, will best insure the beneficent ends of its institution: *Resolved,*" &c., " that the following articles be proposed," &c. The States, as independent sovereignties, could certainly have protected their own citizens, by their fundamental laws, from the effects of improper legislation by their legislative assemblies; but as the citizens of all

the States were to be amenable to the laws of the General Government, when passed in conformity to the powers conferred by the Federal constitution, over which laws the States, as such, possessed no power, it was deemed essential to the security of the citizens, and to the rights of the States, to place further restrictions upon the powers of the Federal Government, as the same is provided for in these amendments. But we are not left to reason and the history of the country alone to sustain our view. The authority of adjudged cases abundantly sanctions it.—Jackson v. Wood, 2 Cow. Rep. 818, n. b; Livingston v. The Mayor of New York, 8 Wend. 100; Barron v. The Mayor and City Council of Baltimore, 7 Peters' Rep. 247, *per* C. J. Marshall. Indeed, the point has been expressly so ruled by this court, in Boring *et al.* v. Williams, 17 Ala. 510.

So much for the provision of the Federal constitution.

With respect to the legislative power of the State, we have frequently announced that in reference to all legitimate subjects-matter of legislation, this power was unlimited, except in so far as it was restrained by the Federal or State constitutions (Stein v. The Mayor and Aldermen of the City of Mobile, at the present term; *Ex parte* Pickett, 24 Ala. 96); while the Federal Government can rightfully exercise no power save such as is expressly delegated by the constitution of that government, and such as is necessary and proper to carry into execution some express power.

Having seen that the Federal constitution does not in any wise restrict the State in the exercise of its legislative functions, in prescribing the forms of the indictments and the mode of criminal trials, let us next consider what influence our own bill of rights has upon the subject.

The twelfth section of the bill of rights evidently inhibits the Legislature from passing any law authorizing a party to be proceeded against criminally by information, for an indictable offence; but this in no wise restrictsthe Legislature from enacting laws defining offences and their punishment, and proscribing forms of indictments suited to them, as well as the mode of trying them. They cannot say a party may be proceeded against for an indictable offence by information—that is, they have no power to say a party can be put upon his trial for an

offence which is indictable, unless the accusation brought against him is made upon the oath of a grand jury.

We readily concede, that to give effect to the spirit and meaning of this clause, there must, in all prosecutions for indictable offences, be such an accusation at the suit of the State, found to be true by the oaths of a grand jury, as shall furnish to the accused reasonable information of what he is called upon to answer, by setting forth the constituent elements of the offence or crime with which he is attempted to be charged. It would not be competent for the Legislature to make that an indictment which failed to accuse a party of a crime. Regard must be had to the nature of the accusation, as embodying and setting forth with reasonable certainty a charge of the crime for which the prisoner is to be tried. An indictment for larceny could not, by legislative enactment, be made an indictment for murder, without violating the true spirit and meaning of this provision in the bill of rights; but if the indictment set forth, with reasonable certainty, the crime for which the accused is to be tried, as the Legislature may alter the common law, it may declare such indictment to be good, notwithstanding it may fail to contain many averments required by the common law to make it valid. There must be an indictment, before a party can be put on his trial for an indictable offence. In other words, there must be "a written accusation of the party, at the suit of the State, of a crime, presented upon oath by a jury of twelve or more men, called a grand jury."—Archb. Cr. Pl. (6 ed.) vol. 1, p. 63, and notes.

In the case before us, there is an indictment accusing the prisoner on the oath of a grand jury, that on a named day, he " unlawfully and with malice aforethought, killed George T. Sharp, against the peace," &c. Now, although this indictment would not be good at the common law, because it is wanting in certain formalities which were required by the rules of that law; yet it is certainly an indictment—that is, it is a "written accusation of a crime against the prisoner, found by a grand jury;" and it is a compliance, in our opinion, with the spirit of our fundamental law. This being the accusation, when the prisoner is arraigned for trial, he is entitled to demand the nature and cause of it, and to have a copy of it, in order to enable him to examine it by himself and counsel, so as to test its legal suffi-

ciency by demurrer, or prepare to defend against the charge on the facts. This is all that is meant by the clause in the bill of rights, by which the accused, in criminal prosecutions, has a right to demand the nature and cause of the accusation against him. The charge is not to be concealed from him, but he is entitled to be fully advised as to what the accusation is against him, that he may prepare to meet it. This clause has no bearing upon the question, as to what shall be the form of the accusation, but entitles the prisoner to demand its nature, whether it be good or bad: he has the right, upon his arraignment, to have the indictment read to him : he is thus advised of the nature and cause of it: he has the further right to "*have a copy thereof.*"—10th Sec. Bill of Rights.

Upon the whole, we are satisfied that the Legislature has the power to make this a good indictment for murder in the first degree, as well as for murder in the second degree ; leaving it to the jury to find the degree, and to affix the punishment, within certain restrictions as prescribed by the Code. England, as well as most of the States of this Union, has passed laws simplifying the forms of indictments, and curtailing them of much useless verbiage.

We must then go to our statutes, and not to the common law, to test the sufficiency of this indictment, and tested by these, there is no question as to its sufficiency.

It is not pretended that the prisoner was tried out of the county in which the offence was committed. It was competent for the Legislature to enact that it should not be necessary to allege where the offence was committed, but that the proof must show it to have been within the jurisdiction of the county in which the indictment was preferred.—Code § 3514. The accusation of the commission of the crime, is the *gravamen* of the indictment. This cannot be dispensed with ; but the particulars, as to time, place, and circumstance, not constituting essential elements in the crime, may be dispensed with in the indictment by the statute, and be left as matter of proof, as establishing or not the jurisdiction of the court. We can see no inconvenience or injury, which could result to the accused, from this, as the statute now secures to him a trial in the county where the offence was committed, unless upon his motion it is taken to another county on change of venue.

As to the objection, that the indictment fails to show that the grand jury were sworn, we have only to say, that we have frequently decided that the caption of the indictment, showing when, and where, and by whom the court was held, and who were selected and sworn as grand jurors, must be looked to in aid of the indictment, as forming a part of the record, and need not be repeated in the body of the indictment. Reeves v. The State, 20 Ala. 33; State v. Murphy, 9 Porter 487; State v. Morgan, 19 Ala. 556.

As to the verdict and judgment: The jury find the prisoner " guilty of murder in the first degree," and say they " sentence him to be hung." This verdict is sufficient, as it conforms to the Code (§ 3082), except as to the verbiage used in the conclusion. The Code (§ 3080) provides, that the prisoner, being found guilty of murder in the first degree, *shall suffer* death, or imprisonment for life, at the discretion of the jury trying the same. Here the jury do not say, in so many words, he shall suffer death, but that he shall be hung. This finding is unequivocal. The term " hung," or "sentencing a man to be hung," found in this collocation, means to suspend him by the neck until he is dead.—1 Bouv. Law Dictionary, Title " Hanging"; Web. Dic.

That the jury say they " sentence" him to be hung, is no objection. It is not the most appropriate word perhaps; but they evidently mean, that, in their discretion, they affix to the crime of which they convict him the punishment of death. Any other construction would be altogether hypercritical, and cannot be indulged. The end of the statute is attained, when the jury, by unequivocal terms, certify to the court the punishment they have affixed; and their verdict must not be too rigidly construed, but according to the plain, common-sense meaning of the terms they use, as understood in the community.—Nabors v. The State, 6 Ala. 200; 1 Chit. Crim. Law 644,-6, and notes; State v. Upton, 1 Dev. 513. It is sufficient, if their meaning is obvious and unmistakeable, although they may not couch their verdict in technical language.

The objection to the sentence of the court, that the dates of such sentence and the day fixed for execution thereof are expressed by figures, cannot be sustained. In modern times, this has been held to be sufficient, even in the indictment, if the date

is plainly legible.—5 Bacon's Abr., by Bouv., 81; State **v.** Hodgeden, 3 Verm. 481; State v. Raiford, 7 Por. 701.

We come next to consider the questions raised upon the bill of exceptions taken in the case.

When the office of constable is vacant in a justice's precinct, or in cases of emergency, the justice has power to appoint a person to act in his place, without requiring bond and security; and such appointment extends to the execution of all process, except the collection of money on executions. The justice is the proper judge of the emergency requiring such appointment; and when one has thus been appointed for the execution of a warrant, there can be no doubt of his authority to do so any where in the county of the justice's residence.—Code § 711.

The court below, by an affirmative charge, and which we cannot intend was abstract, affirmed the validity of the warrant under which the deceased was proceeding to make the arrest when killed by the prisoner. If the warrant was invalid upon its face, and showed that the justice had no jurisdiction of the matter involved in it, then, as it would be void, and as the officer in whose hands it was placed for execution must be presumed to know the law, and could see that it was void, he was a trespasser. Although there is much uncertainty and contrariety of opinion in the books, as to when an executive officer shall be protected by virtue of process placed in their hands, yet, we believe, they are all agreed in this: "that a constable cannot justify any arrest by force of a warrant from a justice of the peace, which expressly appears, upon the face of it, to be for an offence whereof the justice of the peace hath no jurisdiction," &c. I quote the language of Serjeant Hawkins (Pleas, vol. 2, p. 130, § 10), who says that this seems clear.

If, then, it appears upon the face of this warrant that the justice had no jurisdiction to order the arrest of the prisoner, the deceased, in his attempt to execute it, might be regarded by the prisoner as a trespasser, as soon as he entered his premises, and might be treated as such. This is the law, as clearly announced in Duckworth v. Johnson, 7 Ala. 578; Sasnett v. Weathers, 21 *ib*. 673; and Crumpton v. Newman, 12 *ib*. 199. How far the prisoner might lawfully go in resisting the deceased, conceding that the latter was a tres-

passer, is fully discussed in Carroll v. The State, 23 Ala. 28, and need not now be more particularly adverted to.

Is the warrant in this case void upon its face? Does it show, upon its face, that the justice had no jurisdiction of the complaint, the substance of which the law requires should be stated in it?—Code § 3341. Upon our first examination, we thought it was not void, but informal merely.— Upon having our attention more particularly called to it, by the counsel for the prisoner, we are fully satisfied that our first impression was wrong, and that it is wholly void.

The Code (§ 3340) declares, that, "Whenever complaint is made to a magistrate, that any person has threatened, or is about to commit an offence on the person or property of another, he must examine the complainant, and any witness he may produce, on oath, reduce such examination to writing, and cause it to be subscribed by the parties so examined." Section 3341 declares, "If, on such examination, it appears that there is reason to fear the commission of any such offence, by the person complained of, the magistrate must issue a warrant, directed to any lawful officer of the State, containing the substance of the complaint, and commanding such officer forthwith to arrest the person complained of, and bring him before him, or some other magistrate having jurisdiction in the matter."

The warrant in this case appears, upon its face, to be predicated upon the affidavit of Mary Noles, wife of the prisoner, which merely states that she "is *afraid* that her husband, Joseph Noles, of said county, laborer, will beat, wound, maim or kill her, or do her some bodily hurt." It sets forth no other cause of complaint, than in the recital of this oath, and proceeds " these are therefore to command you," &c.

This statute, being in restraint of liberty, and penal, must be strictly construed ; that is, it may not be enlarged, by construction, beyond the plain import of the terms in which it is couched.

According to it, two cases only exist, where sureties for the peace may be demanded by the complaint of a party : one is, where any person " has threatened" to commit an offence on the person or property of another ; the other, where such person "is about to commit" such offence.

This warrant embraces neither, but merely that the prisoner's wife "is afraid" he will commit such offence. This is a substantive and distinct ground, not embraced by the statute ; and for the obvious reason, that we should have but little security for personal liberty, if the mere fears of others, however groundless, could deprive us of it.

We are aware, that this looks like a technical ground upon which to reverse a cause of this grave importance; but it is our duty to decide the law, irrespective of consequences; and being satisfied that the warrant is void, we have no alternative but to reverse the sentence, and remand the cause, that the prisoner may be again tried.

This judgment will be accordingly here rendered, and the prisoner will remain in custody to await his further trial.