# Sanders *v.* The State.

## *Murder.*

(Decided June 30, 1911.   56 So. 69.)

1. *Homicide; Indictment; Sufficiency.*—The code form of indictment for murder in either degree, and for manslaughter in either degree, is sufficient and sufficiently advises the accused of the nature and cause of the accusation within the Constitution.

2. *Same; Requisites.*—Except in killings in sudden rencounters by means of concealed weapons (section 7086, Code 1907) indictments for murder in either degree must allege that the homicide was committed with malice aforethought.

3. *Same; Evidence; Dying Declarations.*—The admission of a decedent's dying declarations is justified where the preliminary evidence shows that the wounds were inflicted on Saturday evening before the Monday noon following at which time the decedent died, and that on Sunday after the shooting the decedent said to his half brother that he did not see how he could recover, and that he believed he would die.

4. *Same.*—To justify the admission of dying declarations, the court should be satisfied, after considering all the circumstances, that at the time of the making of the declarations the decedent positively believed that he had no hope of life; it is not essential, however, that he should in so many words express his conviction that he was in extremis.

5. *Indictment and Information; Clerical Error; Effect.*—An indictment is not necessarily vitiated by a mere clerical error, unless the error changes the word into one of different import or so changes the sense that one of ordinary intelligence cannot from the context determine with certainty the meaning.

6. *Same.*—An indictment alleging that the accused "with malice aforethougt" killed a named person by shooting him is a sufficient charge of murder in either degree, the word "aforethougt" being sufficiently near in point of sound to the proper word.

7. *Evidence; Judicial Knowledge; Common Knowledge.*—The court judicially knows, as a matter of common knowledge, that a gun full choked or modified is less likely to scatter shot over a given surface at a given distance than a gun of open bore, unless the distance is extremely short.

8. *Same; Opinion Evidence.*—Where the witness has no knowledge of the character of the gun, or its carrying capacity, he cannot give his opinion as to how far a man who shot the gun would have to stand from the decedent to make the wounds which the witness testified were upon the deceased.

9. *Same*—One is not competent to testify as an expert as to how far a man would have to stand when firing a gun to make a described wound, although such witness had lived in the country most of his life, and was accustomed to the use of guns, etc., but had made no study of the manner and extent guns will carry or scatter.

10. *Criminal Law; New Trial; Ruling on Motion.*—The statute does not apply to criminal cases, and hence, rulings on motion for new trial cannot be reviewed in such cases.

APPEAL from Dallas Circuit Court.

Heard before Hon. B. M. MILLER.

Arthur Sanders was convicted of murder in the second degree, and he appeals. Affirmed.

The original indictment is in words and figures as follows: "The grand jury of said county charged that, before the finding of this indictment, Levi Sanders, alias Levi Zanders, and Arthur Sanders, alias Arthur Zanders, unlawfully and with malice aforethought killed Jeffy Lewis by shooting him with a gun, against," etc.

CRAIG & CRAIG, for appellant. The motion to strike and quash the indictment must be granted. The word "aforethought" is essential and cannot be supplied by intendement.—*Wood v. The State,* 50 Ala. 144; Subdiv. 76, Sec. 7161, Code 1907; *Griffin v. The State,* 90.

Ala. 583; *Parker v. The State,* 114 Ala. 690. On these same authorities, the demurrers to the indictment should have been sustained.—*Findley v. The State,* 61 Ala. 203. A sufficient predicate was not laid for the admission of dying declarations.—*Young v. The State,* 95 Ala. 6; *Titus v. The State,* 117 Ala. 20. Under the other testimony admitted as to the character of the wounds and the distance apart of the combatants, the witnesses should have been permitted to state the carrying capacity of the gun and the distance required to have made the wounds described.—*Adler v. Pruitt,* 53 So. 316. Counsel also cite authority in support of their contention that a new trial should have been granted.

ROBERT C. BRICKELL, Attorney General, and WILLIAM L. MARTIN, Assistant Attorney General, for the state. The manner of writing the word "aforethought" in the indictment does not in any way tend to vitiate or invalidate the indictment. It clearly appears what was meant and intended.—*Wood v. The State,* 50 Ala. 144; *Grant v. The State,* 55 Ala. 207; *Hampton v. The State,* 133 Ala. 182; *Stallworth v. The State,* 115 Ala. 14. The following cases from other jurisdictions are cited in this connection: 4 Tex. App. 70; 6 Ib. 433; 7 Ib. 44; 25 Ib. 325; 10 Ib. 215; 147 Mo. 70; 70 S. W. 751; 58 Vt. 378; 11 Atl. 601; 8 D. C. 237; 4 Wis. 417; 4 Ind. 453; 69 Mo. App. 444; 32 La. Ann. 782; 3 Ind. 451. The predicate was sufficient for the admission of dying declarations.—*Hussey v. The State,* 87 Ala. 128; *Pulliam v. State,* 88 Ala. 3; *McQueen v. The State,* 94 Ala. 50; *Blackburn v. The State,* 98 Ala. 65; *Heininburg v. The State,* 153 Ala. 17. The court properly declined to allow the witness to answer as an expert on gunshot wounds. —*Page v. The State,* 61 Ala. 18; *Wilkinson v. Morgan,* 30 Ala. 573; *Gunter v. The State,* 83 Ala. 107; *Porter v. The State,* 135 Ala. 54.

De GRAFFENRIED, J.—In the case of *Noles v. State*, 24 Ala. 672, the Supreme Court, in upholding a form of indictment prescribed by the Code, said that when the Code prescribes a form, or specially directs what shall be prescribed in an indictment for a particular class of offenses, "the proper course is for the pleader to adopt the form or pursue the special directions thus given."— *Elam v. State*, 25 Ala. 53.

This necessity is due to the terseness, and, in many instances, the broad, general terms employed by the Code form in expressing the crime charged in the indictment. The history of the American people and of their ancestors in England, Ireland, and Scotland is coextensive with and forms a part of the history of that section of the Bill of Rights, found in the Constitution of the United States and of every state in the American Union, which provides that "in all criminal prosecutions the accused has the right to demand the nature and cause of his accusation." So deeply imbedded has that principle become in our national life that it has, in truth, become a part of the life of each individual within our protection and is as much a necessity to his natural existence as his right to personal liberty or to pursue, without molestation, in a lawful way, a useful vocation. Courts should therefore rigidly enforce the application of this constitutional requirement upon legislative enactment to which in its letter or spirit it applies; and as our Code forms of indictment are general to the extreme in their language, and in many instances open a broad field to prosecutors actuated by feelings of revenge or hatred, rendering it difficult, in many instances, for a defendant, even though innocent, to successfully defend against perjured testimony, our courts should, in each instance, require the indictment to con-

form in every substantial particular to the Code form when drawn under the form prescribed by the Code.

The Code forms of indictment for murder in either of its degrees, and for manslaughter in the first and second degrees, are amply sufficient to meet the letter and intent of the above constitutional requirement, and when such indictments comply, in all of their averments, substantially with the Code forms, they are legally sufficient. Every defendant, when so indicted, knows, from the express language of the indictment itself, ex necessitate the degree of the offense with which he is charged, the name of the deceased unless the name is unknown to the grand jury, and the means alleged to have been employed to produce death unless such means are also unknown to the grand jury.

One of the essential averments of an indictment for murder in either degree, except murder by killing in sudden rencounter with concealed weapon, in this state is that the homicide was committed "with malice aforethought." An indictment, except in case of murder in sudden rencounter with concealed weapon under section 7086 of the Code, which omits the word "aforethought" or its equivalent, does not charge murder in either degree.—*Etheridge v. State,* 141 Ala. 29, 37 South. 337.

In the case of *Griffin v. State,* 90 Ala. 583, 8 South. 812, the Supreme Court held that an indictment charging that murder had been committed "with malice aforethou" does not allege malice aforethought, and that the indictment was legally insufficient. In that case the court was plainly right, for there is no word in the English language which approaches in sound that produced by giving expression to the sound represented by the letters "aforethou." For the same reason, as stated by the court, "great precision should be observed in matters which vitally affect the life and liberty of the citi-

2 CA

zen," the court held insufficient an indictment for burglary in *Parker v. State,* 114 Ala. 690, 22 South. 791, which charged that defendant broke into and entered the "dwell house" of another; the word "dwelling house" and "dwell house" being not idem sonans.

In each of the above cases, however, the court recognized the soundness of the doctrine that a mere clerical error, or misspelling or the omission of letters, did not necessarily vitiate an indictment. In the case of *Griffith v. State, supra,* the court said: "The general rule is that a clerical error, or misspelling, or the omission of letters from a word, does not vitiate an indictment, unless the word is thereby changed into one of different import, or the sense so obscured that a person of ordinary intelligence cannot from the context determine with certainty the meaning."

In the case of *Grant v. State,* 55 Ala. 201, in which the indictment charged the defendant with the larceny of ten $20 "gol pieces," and which indictment was held sufficient as a charge of the larceny of ten $20 "gold pieces," the Supreme Court said: "Neither clerical nor grammatical errors vitiate an indictment, unless they change the words, obscure the sense. * * * The defendant, on an inspection of the indictment, or on hearing it read, would know that it was intended to charge him with larceny of ten $20 gold pieces, and the court would, with certainty, understand that such was the accusation. The case of *Wood v. State,* 50 Ala. 144, is of doubtful propriety; but, conceding its correctness, it is distinguishable from this case. The omission of the letter 'l' from the word 'malice,' in that case, converted it into a word incapable of like sound. Before an objection because of false grammar, incorrect spelling, or mere clerical errors, is entertained, the court should be satisfied of the tendency of the error to mislead, or to

leave in doubt as to the meaning a person of common understanding, reading, not for the purpose of finding defects, but to ascertain what is intended to be charged."

Speaking on the same subject, the Supreme Court, in the Case of *Hampton v. State,* 133 Ala. 180, 32 South. 230, says: "The copy of the transcript does not show clearly how the word 'person' was spelled, whether 'peurson' or 'person.' But it is of no consequence whether the one or the other, since it is simply a clerical or grammatical error. It is impossible to read the complaint and be in doubt as to the word intended or its import. The same may be said of the word 'pistol' if we concede that it was written 'pestol.'"

The original indictment in this case is before us, and a careful examination of it convinces us that it is not subject to the objection to its sufficiency taken to it by appellant, and there is nothing in the word "aforethougt," as it appears written in said indictment, calculated to "mislead, or leave in doubt as to its meaning a person of common understanding, reading, not for the purpose of finding defects, but to ascertain what is intended to be charged." Counsel for appellant insist that the final "t" is left from the word, and that it reads "aforethough"; but we cannot accept the reading of appellant, for it more clearly resembles "aforethougt" than "aforethough," and "aforethougt" is sufficiently near, in point of sound, to "aforethought," to be covered by the doctrine of idem sonans. In our opinion, an ordinary man reading the indictment for the purpose of ascertaining its meaning would, in all probability, not detect the defect complained of, and, if he did so, he would, from the context, know, as a matter of common sense, the exact word which was in fact used, and that the error complained of was merely clerical or an error in spelling. The trained eye of an astute lawyer might

detect the slight infirmity, but not the eye of the ordinary man looking for the substance of the charge and not mere inaccuracies of spelling contained in the words of the indictment. Neither the court, the counsel, the defendant, nor the jury could have been mislead or suffered injury by reason of the defect complained of, and the court committed no error in holding that the indictment properly charged the defendant with murder.

Bluford Lewis, a witness for the state, testified to certain dying declarations made to him by the deceased. The defendant objected to the introduction of evidence of such dying declarations upon the ground that a sufficient legal predicate had not been laid to authorize such evidence to be introduced. The court overruled the objection, and the defendant excepted. As a predicate for the admission of evidence of such dying declarations, the witness Bluford Lewis, who was a half-brother of the deceased, testified as follows: "I saw Jeffie Lewis after he was shot. It was about 12 o'clock when I saw him. I did not talk with him until that evening. I sent for the doctor and came back and had a talk with him. He said he was shot mighty bad and did not see how he could ever get over it. He said he believed he was going to die. He told me that after he got shot. He did not die until Monday at 12 o'clock."

The evidence which had then been introduced by the state tended to show that the deceased was shot on a Saturday night about 8 o'clock in the head and face, and that he died on the following Monday, as a result of the wounds, at 12 o'clock. The above statement was made, according to the testimony of the witness Bluford, on Sunday evening after the shooting.

The judge presiding at the trial of the defendant, not the jury, was the forum to which the evidence on this subject was addressed, as it was the court's province,

[Sanders v. The State.]

and not that of the jury, to say whether such dying declarations were admissible. "On account of the character of this kind of evidence, the rules require that it be received with very great caution, and that the primary facts upon which its admissibility depends should be closely scrutinized; and although it is not an indispensible prerequisite that deceased should in so many words express his conviction that he was in extremis, that death was impending, that there was no hope of life, yet the judicial mind should be clearly satisfied, after careful consideration of all the circumstances, that, at the time the declarations were made, such was the conviction of the mind of the defendant.".—*Justice v. State*, 99 Ala. 180, 13 South. 658.

We can conceive of no more important duty devolving upon the judge of a trial court than that, which is cast upon him by the law, of passing upon the sufficiency, vel non, of the preliminary evidence offered as the predicate to the admission of a dying declaration in a case in which the defendant is charged with murder. While the law admits such declarations out of necessity and upon the theory that, when made in the full sense of impending death, with all hope of life abandoned, they are entitled to the same credit as, but not more than, if given under the sanctity of an oath, nevertheless the weight to be given such declarations is with the jury. Our juries are composed of laymen, not lawyers, and, in the popular mind, the hour of dissolution clothes the last words on earth with a solemnity and sanctity which no oath can impart, and, if dying declarations are im properly admitted, an injury irreparable in its nature to one who has in fact been guilty of the violation of no law may be by a court committed and result in the conviction of an innocent man of a grave, even capital, offense.

Taking into consideration the place and character of the wounds inflicted on deceased, that, if the evidence is to be believed, he told this witness that he did not see how he could get over it, that he believed that he was going to die, and that, in fact, he did die from his wounds the next day at midday, and that, after such alleged declaration, we find no evidence that he did not believe his death to be immediately impending, we are of the opinion that the court committed no error in admitting evidence of the dying declarations of the deceased.—*Oliver v. State*, 17 Ala. 587; *Kilgore v. State*, 74 Ala. 1.

There was a sharp conflict in the evidence as to the character of the wounds of the deceased. The evidence, without conflict shows that the deceased came to his death by wounds inflicted by being shot with a shotgun. The wounds, according to the evidence of the state, were in the head and neck of the deceased. On the other hand, the evidence for the defendant tended to show that the deceased was "shot from his head down to his short ribs. One tooth was broken out. The shot that went in below the nipple in the ribs was the shot that killed him."

The witness who testified, on behalf of the defendant, to the location of the wounds on deceased, and whose testimony on that subject is quoted above in full, was shown to be 43 years of age, and it was shown that he had been accustomed to the use of guns all his life. While this witness was being examined, he was asked by the defendant the following questions, to both of which the state objected; the objections being sustained and the defendant excepting:

"You saw those wounds; how far would you say a man who shot the gun would have to stand from the man who was shot, to make those wounds?

[Sanders v. The State.]

"In shooting a gun that would scatter as that was on a man's body, how far would the man shooting the gun have to stand from the man he shot "

There was no evidence before the jury as to whether the gun with which the wounds were inflicted was of small or large caliber, or bore, or whether it was of full or modified choke or open bore.

This court knows, judicially, that a full-choke gun is less liable to scatter its shot over a given surface at a given distance, unless the distance is extremely short, than one of modified choke, and that an open-bore gun is more likely to scatter its shot, at a given distance over a given surface, unless the distance is extremely short, than either one of full or modified choke. In fact many shotguns are made with one barrel choked and the other open, to meet the exigencies of long or short shots.

It is therefore evident that the distance required for one gun to have produced the scattered wounds on the person of the deceased would not have fixed the distance required for another gun of different caliber or bore, and without any knowledge of the character of the gun, as above defined, it was impossible for the witness to have answered the above questions, in the form in which they were put, accurately and intelligently.

In addition to the above, the witness Saffold did not show himself to be an expert on the subject inquired about. On his knowledge of shotguns, he says, "Have lived in the country most all of my life, and have been accustomed to using shotguns all my life"; but he nowhere says that he has, at any period, made the subject inquired about one even of casual study. It is a matter of common knowledge that a shotgun at close quarters will lump its shot and perforate only a small space, and the greater range the greater the surface over which it will place its shot; but we seriously doubt whether a man of

ordinary observation accustomed to the use of firearms all his life, with any satisfactory degree of accuracy, can say what space a shotgun which he never saw and as to the caliber, bore, and length of barrels of which he knew nothing, will cover in a given distance with its shot. If the shot were placed on the body of deceased as the evidence for the state tended to show, the gun with which the wounds were inflicted was, in all probability, fired at a point nearer the deceased than if they were scattered over his body as claimed by the defendant; but how much nearer could not, even by an expert, be told with that degree of reasonable accuracy required by law in the absence of any knowledge on the subjects above referred to. The court therefore committed no error in refusing to allow the witness to answer the questions.

The granting or the refusal to grant a motion for a new trial in a criminal case, by the trial court, is not subject to review in an appellate court. The statute giving the right of appeal from the judgment of a trial court in granting or refusing to grant a new trial does not apply to criminal cases.

There is no error in the record, and the judgment of the court below is affirmed.

Affirmed.