179 So.2d 35

**Riley SANDERS**

v.

**STATE of Alabama.**

6 Div. 130.

Supreme Court of Alabama.

Sept. 30, 1965.

J. Howard McEniry and A. Vincent Brown, Bessemer, for appellant.

Richmond M. Flowers, Atty. Gen., and John C. Tyson, III, Asst. Atty. Gen., for the State.

LAWSON, Justice.

Appellant, Riley Sanders, was tried on an indictment containing two counts. The first count charged him with the murder in the first degree of Thomas B. Marks, and the second count charged him with robbery of the same person.

Sanders was unable to employ counsel, so prior to arraignment the trial court, under the provisions of § 318, Title 15, Code 1940, appointed able members of the Jefferson County Bar to represent him.

Before arraignment, Sanders filed a motion "to require the solicitor to furnish to his attorneys any information held by him in the form of purported confessions, statements by witnesses, charts, diagrams, hospital records, court records, notes from the Grand Jury proceedings or other information held by him * * *." This motion was granted by the trial court "only as to all statements, reports, notes, and charts of all witnesses who testified at the preliminary hearing or the Grand Jury against defendant, and of Dorothy Jo Patton whether she testified or not, and alleged confessions of defendant."

Prior to arraignment Sanders filed a motion for a change of venue, which was overruled and denied.

Also, prior to arraignment, Sanders by demurrer challenged the indictment and each count thereof on various grounds. The demurrer was overruled.

Upon arraignment, Sanders pleaded not guilty and not guilty by reason of insanity and not guilty by reason of self-defense. The latter plea was unnecessary, self-defense being covered by the plea of not guilty. See Roberson v. State, 183 Ala. 43, 62 So. 837. The court-appointed attorneys were present at arraignment. Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed. 2d 114.

At the trial, after the State had rested, one of the lawyers for Sanders advised the court that with the consent of the defendant he would like to withdraw the plea of not guilty by reason of insanity. That request was granted by the trial court. Thereupon counsel for Sanders advised the court that "we would like to withdraw the not guilty plea to Count 2 of the indictment and plead guilty thereto." In response to that motion or request, counsel for the State moved "the Court to nol pros. Count 2 of the indictment which charges the defendant, Riley Sanders, with robbery." Counsel for Sanders advised the court that "we have no objection to it." The court stated: "All right. I will grant the State's motion and enter a judgment to nol pros Count 2 of the indictment." Such a judgment was entered.

The defendant, Sanders, rested without offering any testimony.

The jury found Sanders guilty of murder in the first degree and imposed the death penalty. Judgment and sentence were in accord with the verdict.

The appeal here is under the automatic appeal law applicable to cases where the death sentence is imposed. Act 249, approved June 24, 1943, General Acts 1943, p. 217, carried in the 1955 Cum. Pocket Part to Vol. Four, 1940 Official Code, and in the 1958 Recompiled Code as Title 15, §§ 382(1) et seq.

The attorneys who represented Sanders in the trial court were appointed to represent him on this appeal. They have filed a brief in his behalf.

## Motion to Produce

In brief filed here on behalf of Sanders it is not contended that the trial court erred in its ruling on the motion to produce. But we will consider the court's action on that motion in view of the fact that § 389, Title 15, Code 1940, makes it the duty of this court to "consider all questions apparent on the record" and to "render such judgment as the law demands." Sanders v. State, 259 Ala. 520, 67 So.2d 2. If the question reserved is of substance and might have affected the result, it is of no importance that the appellant or his counsel have not argued the question. Wesson v. State, 238 Ala. 399, 191 So. 249.

In arguing the motion to produce to the trial court, counsel referred to "Parsons versus Alabama," to the "Jencks decision," to "18 U.S.C.A. § 3500, The Jencks Act," and to "Brody versus Maryland." No citation was given to any of the court decisions to which reference was made.

We assume that "Parsons versus Alabama" is the case of Parsons v. State, 251 Ala. 467, 38 So.2d 209. In that case we were concerned with the right of a defendant in a state court to obtain certain articles and reports in the possession of a United States attorney or agents of the Federal Bureau of Investigation. We were not there concerned with the right of a defendant in a state court to require the State prosecutor to deliver statements, articles or information in his possession to the defendant for use in the preparation of his defense. See Mabry v. State, 40 Ala.App. 129, 110 So.2d 250, petition for cert. dismissed, 268 Ala. 660, 110 So.2d 260; McCullough v. State, 40 Ala.App. 309, 113 So.2d 905, cert. denied, 269 Ala. 698, 113 So.2d 912.

The "Jencks decision" to which reference was made by counsel is, no doubt, the case of Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1013, 1 L.Ed.2d 1103, decided by the Supreme Court of the United States on June 3, 1957, wherein it was held that the defense in a criminal prosecution was entitled, under certain circumstances, to ob-

tain, for impeachment purposes, statements which had been made to government agents by government witnesses. See Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287. The decision in Jencks v. United States, supra, brought about the so-called "Jencks Act" (71 Stat. 595, 18 U.S.C. § 3500), apparently designed to clarify and delimit the reach of Jencks.

We do not think the case of Jencks v. United States, supra, or the "Jencks Act" can be said to authorize the relief which Sanders sought in his motion to produce. No constitutional provision was invoked in the Jencks case. The holding there was based on the "standards for the administration of criminal justice in the federal courts." Mabry v. State, supra. It has been said to apply only to federal criminal prosecutions. McKenzie v. State, 236 Md. 597, 204 A.2d 678. The "Jencks Act" by its terms applies to criminal prosecutions brought by the United States.

We assume that counsel intended to cite to the trial court the case of Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, rather than "Brody versus Maryland." The Brady case, supra, dealt with the suppression by the State prosecutor of an extrajudicial statement made by Brady's companion, which Brady's counsel prior to trial had requested the prosecution to allow him to examine. The suppression of the confession or statement was held to be a violation of the due process clause of the Fourteenth Amendment to the Constitution of the United States.

We can see no violation of the rule of the Brady case, supra, in the action of the trial court in refusing to require the State to produce all that was requested by Sanders in his motion to produce. He was not entitled to a mere fishing expedition and the court, in effect, ordered the State to permit counsel for Sanders to see and examine the confessions made by Sanders and documents which would be useful to impeach State witnesses or attack their credibility. We are not called upon to say that

Sanders was entitled to all of the relief given him by the trial court. We simply hold that the trial court did not err to a reversal in refusing to award him all of the relief prayed for in his motion to produce.

For an excellent treatment of the discovery rights of defendants in criminal prosecutions see the article by Hon. L. Drew Redden of the Birmingham Bar published in 22 Alabama Lawyer at page 115.

### Motion for Change of Venue

The motion for change of venue was in the form of an affidavit signed by Sanders' attorneys wherein they state, in substance, that Sanders could not get a fair and impartial trial in the "Bessemer Division of Jefferson County, Alabama," because "several newspaper articles have appeared in the Birmingham News and Birmingham Post-Herald and the Bessemer News pertaining to the alleged killing and alleged murder of Thomas B. Marks," and because the alleged killing of Marks created intense excitement and resentment among the citizens of "Bessemer Division, Jefferson County" and that many expressions of malice and hatred had been made by many citizens of Jefferson County, as well as expressions of opinion that Sanders was guilty of the murder. No other affidavit was introduced in support of the motion and no witness was called to give evidence in support thereof.

On the other hand, the State introduced a number of affidavits from prominent citizens who were so circumstanced as to be familiar with the attitude of the citizenry of the political subdivision wherein the case was set for trial toward Sanders and those affidavits refute the averments of the sworn motion for change of venue and contain expressions of opinion of affiants that Sanders could get a fair and impartial trial in the Circuit Court of Jefferson County, Bessemer Division.

On motion for change of venue in a criminal case, defendant has the burden of showing to the reasonable satisfaction

of the court that a fair and impartial trial cannot be had and an unbiased verdict cannot reasonably be expected. Tiner v. State, 271 Ala. 254, 122 So.2d 738, and cases cited. We do not think the defendant, Sanders met that burden. We hold, therefore, that the motion for a change of venue was properly overruled and denied.

### Demurrer

We have said that an indictment for murder in compliance with Form 79, § 259, Title 15, Code 1940, is sufficient. Noles v. State, 24 Ala. 672; Aiken v. State, 35 Ala. 399; Duncan v. State, 278 Ala. 145, 176 So.2d 840.

■■ The first count of the indictment is in substantial compliance with that form and was not subject to the ground of the demurrer which took the point that it charged Sanders with killing Marks with "malice a forethought" rather than with "malice aforethought." The spacing between the letter "a" and the letter "f" was obviously due to the use of a malfunctioning typewriter or the typing was done by an inexperienced typist. That count sufficiently advised Sanders of the decree of homicide with which he was charged. Before an objection because of false grammar, incorrect spelling, or mere clerical error is entertained, the court should be satisfied of the tendency of the error to mislead, or to leave in doubt as to the meaning a person of common understanding reading, not for the purpose of finding defects, but to ascertain what is intended to be charged. Grant v. State, 55 Ala. 201; Frazer v. State, 29 Ala.App. 204, 195 So. 287, cert. denied, 239 Ala. 309, 195 So. 290; Sanders v. State, 2 Ala.App. 13, 56 So. 69; Curry v. State, 23 Ala.App. 182, 122 So. 298; Hughes v. State, 92 Tex.Cr.Rep. 650, 245 S.W. 440. See 42 C.J.S. Indictments and Informations § 96.

■ The indictment was not subject to the grounds of demurrer that took the point that there was a misjoinder of offenses in that murder and robbery "are not the same family or general nature of offenses." In Smelcher v. State, 33 Ala.App. 326, 33 So. 2d 380, it was expressly held that murder in the first degree and robbery may be joined in one indictment in separate counts.

■ But even if it be conceded that there was a misjoinder, the action of the court in overruling the demurrer to the indictment would be error without injury, since the court entered a *nolle prosequi* as to the second count, the robbery count, upon motion of the State, in which action counsel for Sanders acquiesced. Barnett v. State, 54 Ala. 579; City of Birmingham v. Edwards, 18 Ala.App. 459, 93 So. 233, cert. denied, 208 Ala. 697, 93 So. 922; Foxx v. State, 26 Ala.App. 146, 154 So. 912; State v. Florian, 355 Mo. 1169, 200 S.W.2d 64; Parish v. State, 145 Tex. Cr.Rep. 117, 165 S.W.2d 748; Wimpling v. State, 171 Md. 362, 189 A. 248. Sanders' claim that his substantial rights suffered by reason of the admission of evidence pertaining to the robbery under the second count is without merit. The *nolle prosequi* was not entered until after the State had rested, but the evidence which related to the robbery was admissible under the murder count, the murder and robbery constituting one criminal transaction. Parsons v. State, 251 Ala. 467, 38 So.2d 209; Smarr v. State, 260 Ala. 30, 68 So.2d 6; Johnson v. State, 272 Ala. 633, 133 So.2d 53.

### Facts

On Wednesday, March 11, 1964, around 5:00 P.M., a truck driver found Thomas B. Marks lying on the floor of a building on Third Avenue, in Bessemer, wherein Marks operated his furniture business. The truck driver, who had been sent to Marks' place of business to deliver freight, notified the operator of a store in an adjoining building, who immediately went to the Marks store, where he saw Marks lying on the floor. His head and shoulders were covered with blood. The Bessemer police department was notified immediately and police officers arrived on the scene within a short period of time, as did an ambulance.

Marks was carried to Lloyd Nolen Hospital in an unconscious condition. He died in the hospital at about 3:00 A.M. on Friday, March 13, 1964, without regaining consciousness. The doctor who attended Marks testified that a brain injury was the cause of death. He described the injuries on the head of deceased, saying, " * * * He had multiple gash-type wounds, if that description is permissible, with bony fragments being driven down in several different directions in the wounds, which would give the appearance that they had been caused by a blunt object being struck on the head several times." The doctor also testified that when he first examined him Marks was in a state of shock. He was bleeding profusely from multiple head wounds and there was much swelling about his head and face. There was a considerable amount of hair and bony fragments in his wounds and a small piece of wood was "retrieved in the process of cleaning the wounds." Some brain tissue was exuded.

The police officers who were called to the scene of the crime made a search of the deceased's store. They found a claw hammer about ten feet from where Marks was lying on the floor. The hammer appeared to be covered with blood. The officers also found a beer can or beer cans in the building. The door to the safe was open and the cash drawer was empty.

The wife of deceased, who worked in the store keeping books and doing office work, testified that she left the store about 4:30 P.M. on the afternoon of March 11th. She left her husband alive. Just before she departed she checked the cash drawer and it contained approximately $113 in currency and coins. She had also checked the safe and left therein approximately $400 in money and some checks which were in a white envelope. She described other contents of the safe. The safe was unlocked when Mrs. Marks left the store.

On the day of the crime, Sanders was serving a sentence apparently imposed by the Bessemer City Court upon conviction of some relatively minor offense. But he was seen in the Marks store at about 4:35 on that day by a boy who had been sent by his employer to deliver a can of beer to Marks. The delivery boy did not notice anything unusual about Marks or Sanders, who were the only persons present in the building. Marks was sitting behind his desk and Sanders was "standing in front of the little teller window."

The evidence shows that Sanders knew Marks, having worked for the operator of a store located next to Marks' store. Sanders was shown to have been familiar with the Marks store in that his employer on occasions had assigned him to help the boy who worked for Marks.

Dorothy Patton, a friend of Sanders, testified that she met him at about 3:30 P.M. on the afternoon of the crime at the Top Hat Cafe. Sanders had a pistol. They left the cafe and walked to the corner of Third Avenue and Twentieth Street in Bessemer, where Sanders left her. He returned in about thirty minutes with something in his hand. They walked toward the City Jail. When they reached the jail Sanders gave her a brown bag in which he told her there was some money. He told her to carry the bag and its contents to Juanita Johnson at the Top Hat Cafe. On her way to the cafe some of the money fell through a hole in the bag. She then put the money in the bag in a brown box and proceeded on her way to the cafe. When she arrived at the cafe she and Juanita Johnson went to a room over the cafe where some of the contents of the bag were "poured out on top" of a table. Juanita Johnson kept the money but returned to Dorothy Patton a pistol which had been in the bag. Dorothy Patton then left the Top Hat Cafe and carried a bag containing a pistol and a white envelope to the home of a woman referred to both as Delores and Marie Braxton.

Juanita Johnson and the Braxton woman both testified that Dorothy Patton did leave the articles with them as she had stated. Juanita Johnson testified that she wrapped the money in a "head scarf" and

**460**

locked it in her room. The Braxton woman testified that she put the articles left with her in a suitcase which she put in a closet.

On the morning of March 12, 1964, three police officers and Dorothy Patton went to the Top Hat Cafe. Two of the officers entered the cafe and were accompanied by Juanita Johnson to a room over the cafe where she delivered to the officers a "head scarf" in which money was wrapped. Thereafter a trip was made by one or more of the same police officers to the home of the Braxton woman. One or more of them was admitted by the latter's mother, who shortly thereafter delivered to the officer or officers a brown paper sack which contained a pistol and a white envelope in which were "some checks, some petty cash receipts." The white envelope had written thereon "Marks-Fitzgerald Furniture Co., 1922 Third Avenue, Bessemer, Alabama." Checks and receipts also bore the name of the furniture company.

Early on the afternoon of Thursday, March 12, 1964, after the aforementioned articles had been obtained by the police, Sanders made an oral confession which was immediately followed by a written confession, which was substantially as hereafter summarized.

Shortly after two o'clock on the afternoon of March 11, 1964, he was brought back to the City Jail on a truck with other prisoners. Apparently they had been out on a work detail. Instead of going to his place of confinement, he hid in the "slop pantry" until it was safe for him to leave the jail. After leaving the jail he went to his home, where he got a pistol. He then went to the Top Hat Cafe where he called his "girl friend," Dorothy Jo Patton. Dorothy reached the cafe before 4:00, accompanied by her cousin. Sanders told Dorothy and Juanita Johnson, the operator of the cafe, that he "was going to do something wrong," that he "was going to get me some money so I could get out of jail." Sanders and Dorothy left and walked to the corner of Twentieth Street and Third Ave-

nue in Bessemer. Dorothy remained at the intersection. Sanders proceeded towards the store of the deceased. He observed that the car of Mrs. Marks was not in its usual parking place and he concluded that Marks would be alone in the store, since he knew the colored boy who worked for him left work on Wednesdays at about twelve o'clock. Sanders "thinks" it was about 4:45 P.M. when he entered the store, where he found Marks alone, sitting behind the counter. Sanders began to talk to Marks and asked him for some money for cigarettes. Marks gave Sanders thirty-five cents. While he was talking to Marks the delivery boy brought two cans of beer to Marks. After the delivery boy left the store, Sanders "pulled" his pistol on Marks and told him to put the money in a sack. After telling Sanders, "I hate to see you do this," Marks put into a sack the money that was in his cash drawer. Marks then told Sanders he had broken him. Sanders replied, " * * * all but that in the safe." Marks then took the money from the safe and put it in the sack. The money was in a white envelope. Sanders then tried to "tie him up." Marks shoved Sanders and made a break for the door. Sanders then hit Marks in the head with "the butt of the pistol." After sitting down Marks tried to run again. Then Sanders repeatedly hit Marks on his head with a hammer until Marks "finally passed out." After Marks "passed out" Sanders left the store and returned to Dorothy Patton and told her that he had taken "his money." Sanders gave to Dorothy the sack with "the money and my pistol in it," telling her to take it to Juanita Johnson at the Top Hat Cafe. Sanders and Dorothy walked to the City Jail where they separated. Sanders entered the jail and "turned myself in * * *"

### Confessions

█ Extrajudicial confessions are prima facie involuntary and inadmissible and the duty rests in the first instance on the trial court to determine whether or not a confession is involuntary and unless it so appears it should not be admitted. Myhand

v. State, 259 Ala. 415, 66 So.2d 544; Phillips v. State, 248 Ala. 510, 28 So.2d 542; White v. State, 260 Ala. 328, 70 So.2d 624; Hines v. State, 260 Ala. 668, 72 So.2d 296; Goldin v. State, 271 Ala. 678, 127 So.2d 375; Smitherman v. State, 264 Ala. 120, 85 So.2d 427.

During the examination of the witnesses who heard the confessions made, which examination occurred in the presence of the jury, the State introduced evidence tending to show that no threat was made against Sanders; that he was not physically mistreated; that no reward or hope of reward was offered or held out to him to get him to confess; and that he was told that any statement which he made could be used against him in court. Sanders was not represented by counsel at the time the confessions were made and he was not advised that he had a right to have counsel present. Counsel for Sanders were permitted to examine the witnesses on *voir dire* but did not call any witness to contradict the testimony of the witnesses offered by the State relative to the voluntariness of the confessions.

Sanders, a Negro, was twenty-two years of age at the time of trial. He could read and write. Apparently he was not married. He lived with one Mary Thomas. They have three children.

As shown above, after the commission of the crime Sanders returned to the Bessemer City Jail, where he had been confined. The record does not show that he was interrogated by officers on the night of the crime, March 11th. It does appear that he may have been questioned early on the morning of March 12th by Detectives Pace and Smith, but the record does not show the length of the questioning or the result thereof. Around seven-thirty on the morning of March 12th he was questioned by Detectives Pace, Smith, Grimes and Hill for about fifteen or twenty minutes in the "Roll Call Room" at the Bessemer Police Headquarters. It was brought out by counsel for Sanders on the cross-examination of Detective Grimes that during that question-

ing Sanders admitted that he went to the deceased's store on the afternoon of the crime after leaving "his girl friend, Dorothy Jo Patton, down on the corner of Third and 20th"; that the beer delivery boy came in the store. But he said he did not know anything about the injury to Marks. As a result of the cross-examination of Detective Hill it was made to appear that prior to that questioning, no threats were made against Sanders nor any reward or hope of reward offered to get him to make a statement.

As far as this record discloses, Sanders was not questioned again until early on the afternoon of March 12th. On that afternoon he was first questioned in the office of Chief of Police Barron in the presence of the four detectives mentioned above. Sanders was in Chief Barron's office between thirty and forty-five minutes. It was there that Sanders made his oral confession. The four detectives and Sanders went immediately into an adjoining room where Sanders repeated his statement, which was written down by Detective Grimes. Sanders read the instrument which Grimes had written and then signed it. His signature was witnessed by two of the detectives.

It does not appear that during the questioning Sanders was placed under a bright light, nor is there any evidence that the places where the questionings took place contained any high-powered lights or such devices as are sometimes said to be found in a homicide investigating office. He was not required to disrobe, as far as this record discloses. The questioning of Sanders lasted only a short time. There is nothing in the evidence to indicate that the questioning was so severe and continuous as to require the officers to question in relays. It does not appear that Sanders was kept incommunicado or that he was denied food, drink or cigarettes.

We have given careful consideration to the evidence as it relates to the circumstances and conditions existing at the

time the confessions introduced by the State were made and we are of the opinion that they were not such as to be inherently coercive or to have deprived Sanders of his free will to choose either to admit his connection with the crime, to deny such connection, or to remain silent.

We think the confessions were admissible under the decisions of the Supreme Court of the United States cited in Phillips v. State, 248 Ala. 510, 28 So.2d 542.

But shortly prior to the time this case was tried in the court below, the Supreme Court of the United States decided two cases which must be considered: Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908.

 The opening paragraph of the opinion in Escobedo v. State of Illinois, supra, reads:

"The critical question in this case is whether, under the circumstances, the refusal by the police to honor petitioner's request to consult with his lawyer during the course of an interrogation constitutes a denial of 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. 335, 342, 83 S.Ct. 792, 795, 9 L.Ed.2d 799, and thereby renders inadmissible in a state criminal trial any incriminating statement elicited by the police during the interrogation." 378 U.S. 479, 84 S. Ct. 1759.

Later on in the opinion the Court said:

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. at 342, 83 S.Ct., at 795, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." 378 U.S. 490–491, 84 S.Ct. 1765.

The opinion concludes with this sentence:

"* * * We hold that only when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer." 378 U.S. 492, 84 S.Ct. 1766.

Although the language of the Escobedo opinion seems to limit the holding of the Court to the facts there present, some courts have not so construed it. We cited a number of the cases which have dealt with Escobedo in our recent case of Duncan v. State, 278 Ala. 145, 176 So.2d 840, decided on June 30, 1965. Other cases which deal with Escobedo are cited in Lokos v. State, 278 Ala. 586, 179 So.2d 714, this day decided. We will not further extend this opinion by again referring to the cases which we cited in Duncan v. State, supra, and Lokos v. State, supra.

In this case the predicate laid by the State did not show that a lawyer was present at the time the confessions were made or that Sanders was advised that he was entitled to a lawyer before the confessions were made, and it was brought out on *voir dire* examination by counsel for Sanders that in fact no lawyer was present at the time the confessions were made and Sanders had not been previously advised that he was entitled to a lawyer.

But unlike Escobedo, the record in this case does not show that at the time the confessions were made .Sanders was denied an opportunity to consult with his lawyer. He did not have a lawyer and made no request for a lawyer. .

In Duncan v. State we followed those courts which had held that Escobedo is a controlling precedent only in cases where all the factors specified in Escobedo are present.

As we observed in Lokos v. State, supra, we realize that the construction which we have placed on Escobedo is not in accord with that placed on that case by some of the federal courts, including the United States District Court for the Middle District of Alabama (Washington v. Holman, 245 F. Supp. 116, decided July 6, 1965), and the United States Court of Appeals, Fifth Circuit (Clifton v. United States, 341 F.2d 649), and that in not following those courts our opinions and judgments may be voided in view of the present broad scope of the federal writ of habeas corpus. But we are not bound by the decisions of any federal court on federal questions other than the Supreme Court of the United States, and until that court says our construction and application of Escobedo are wrong, we will stand by them despite the likelihood of being, in effect, reversed by the lower federal courts.

We hold that Escobedo does not require a reversal of this case.

We come now to a consideration of the holding in Jackson v. Denno, supra. That case is discussed at length in Duncan v. State, supra, where we said:

"We have given careful and deliberate consideration to this decision in the Jackson case, supra, and while we realize that the Court only knocked out the so-called New York rule. and apparently gave approval to the Orthodox and Massachusetts rules, nevertheless we are clear to the opinion that the New York rule was avoided not only because in certain instances the question of voluntariness of the confessions was left for the jury's determination, but also because the evidence adduced relative to the voluntariness of the confession was taken before the jury." (176 So.2d 858)

We also said in Duncan that we had reached the "inevitable conclusion that the Supreme Court of the United States will not uphold a conviction where the question as to the voluntariness of the confession is presented in the presence of the jury if a request for a hearing outside the presence of the jury is made." (176 So.2d 858)

Here no such request was made. There was no conflict in the testimony as to the voluntariness of the confessions. Sanders did not seek to testify as to the circumstances surrounding the taking of the confessions or to offer any evidence tending to rebut that offered by the State.

We hold that under the circumstances shown by this record Jackson v. Denno, supra, does not require a reversal of the judgment of the trial court here under review.

The confessions were properly admitted.

### Search and Seizure

The State introduced into evidence the pistol shown to have been used by Sanders in his assault upon the deceased, as well as some of the alleged fruits of the robbery. The State also offered testimony concerning some of the items allegedly taken from Marks by Sanders, which items were not introduced in evidence. There was no motion to suppress such evidence on the ground that it was obtained by unreasonable searches or seizures in violation of the Fourth Amendment to the Constitution of the United States made applicable to the States by Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933, decided by the Supreme Court of the United States on June 19, 1961. See Duncan v. State, supra. Nor were objections on that ground interposed to the introduction of such evidence at the trial.

464

■ We do not consider that the provisions of the automatic appeal statute, supra, which provide that this court may consider any testimony that was seriously prejudicial to the rights of an appellant and may reverse thereon, even though no lawful objection or exception was made thereto, authorizes us to assume the inadmissibility of evidence. For aught appearing in the record before us, the searches and seizures were made under a lawfully issued search warrant.

Federal appellate courts do not seem to apply the federal plain error rule to assertions made on appeal that a judgment should be reversed because evidence was admitted in the trial court which was obtained by an unlawful search or seizure where there was no motion to suppress or objection interposed on that ground at the trial. See Gendron v. United States, 8 Cir., 295 F.2d 897; Robinson v. United States, 8 Cir., 327 F.2d 618.

In disposing of this question in the manner indicated we do not want to be understood as holding that a reversal would result if the record showed that the searches or seizures were made without a search warrant.

None of the articles were taken from the person of Sanders or from places over which he had any control. All of them were taken from places of third persons in the absence of Sanders.

■ Testimony concerning the fruits of the robbery and the items themselves, taken by police officers from the Top Hat Cafe and from the home of the Braxton woman, were properly admitted in evidence, in our opinion, absent a search warrant, since Sanders did not have possession of or a proprietary interest in the stolen property. United States v. Pete, D.C., 111 F.Supp. 292; United States v. Friedman, D.C., 166 F.Supp. 786; State v. Pokini, 45 Haw. 295, 367 P.2d 499.

Sanders may have had a proprietary interest in the pistol which was taken by the police officers from the home of the Brax-

ton woman, where it had been carried by Dorothy Jo Patton after it was placed in her possession by Sanders. As to whether Sanders was in a position to challenge the admission in evidence of the pistol and the testimony concerning it we need not decide since, as before indicated, we will not assume that the searches or seizures were made unlawfully. See United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59.

Mindful of our duty in cases of this character, we have examined the record for any reversible error, whether pressed upon our attention or not. We have here dealt with all questions which we think call for treatment. We find no reversible error in the record and the cause is due to be affirmed. It is so ordered.

Affirmed.

LIVINGSTON, C. J., and GOODWYN, MERRILL, COLEMAN and HARWOOD, JJ., concur.