325 So.2d 200

**James Luther STROUD**

v.

**STATE.**

**1 Div. 518.**

Court of Criminal Appeals of Alabama.

June 30, 1975.

Rehearing Denied July 29, 1975.

William J. Baxley, Atty. Gen. and David W. Clark, Asst. Atty. Gen., for the State.

Ian F. Gaston, Mobile, for appellant.

DeCARLO, Judge.

Second degree murder; life.

Ronald Adams testified that on December 9, 1973, he and his wife, Betty, went to the B & J Lounge around midnight. They were accompanied at the time by Helen

Fields, Bill Fields and Charles E. Lane. As the group entered, someone inside hollered, "Close the g— d— door." Occupying the lounge at the time was a motorcycle gang known as the "Banditos." No other customers were inside except the members and their girl friends. In all, they numbered about seventeen.

The Adams party seated themselves at a table apart from the gang and then Ronald Adams went to the restroom. As he left the restroom, members of the gang blocked his passage with their chairs and he had to forcibly brush through. When he reached their table, Mrs. Adams exclaimed, "Let's leave", and the party began to leave their chairs. Meanwhile members of the gang began to shout obscenities.

When Adams' party approached the door, Ronald Adams turned, pointed to one of the members, and directed him to go outside and they would settle it. After this remark one of the gang shoved the door on Adams, knocking him across the floor. The fight erupted and four or five members of the gang started fighting Fields.

The owner ran over to Charles Lane and asked him "not to let this get out of control." Subsequently the owner screamed, "I'm going to call the police. Everybody get out." At that point Charles Lane fired into the ceiling and more of the members piled on Fields.

Ronald went over to his wife, removed a "38" from her purse and fired into the floor. Realizing it had no effect he returned the gun to the purse, picked up a crutch and attempted to help Fields. About that time a woman screamed and Adams saw two members of the gang holding Lane by the shoulders. Appellant, who was standing to Lane's side, stabbed him. Lane was released and slumped to the floor.

Appellant then turned to Ronald Adams and started stabbing him. Adams jumped to the side of the juke box and called to his wife, "Betty, he's cutting me to death." As he warded off the blows with his feet, Mrs. Adams fired and appellant fell to the floor near Lane.

Adams testified Stroud was wearing long hair and a goatee at the time of the stabbing, and although appellant was clean-shaven and had shorter hair at the trial, Adams was positive he was the one who stabbed Lane.

Betty Adams' testimony was substantially the same as that of her husband, except a question was raised concerning an apparent contradiction in a statement she had given to the police. She explained the statement was typed incorrectly, and she had initialed the correction. The portion in question related to a conversation Mrs. Adams had with her husband after the stabbing, while he was in the emergency room of the hospital. It reads:

". . . I asked Ronnie if one I shot that was cutting him (Ronnie) / /s/ was also cutting Charley (/s/B.A.) and Ronnie said, Yes. (sic)."

Further, at the time she fired, the man stabbing her husband was appellant.

Doctor Montgomery found six stab wounds on the body of Charles Lane and described two in the chest as causing death. An examination of the deceased's blood alcohol content showed .21 percent; .11 percent above the legal intoxication level.

The testimony of Betty Fields followed that of Ronald Adams up to the time when the shots were fired. From that point on she didn't see anything. Mrs. Fields stated she did not see the person who cut the deceased but did see five or six of the gang around when he fell to the floor.

Detective James Gill, one of the Mobile police investigating the homicide, went to Gulfport, Mississippi, along with other officers to arrest the motorcycle gang. He testified appellant admitted being shot and stabbed at the B & J Lounge on December

9, 1973. On cross-examination Detective Gill testified that Lane's general reputation for peace and quiet was bad.

James Luther Stroud testified that on the night in question he and members of the "Banditos" motorcycle gang were having a social drink in the B & J Lounge. During that time five people came in. Two of the men had guns and started a fight. One of the armed men picked up a crutch and hit one of the gang who had a broken foot. As the appellant turned to go out the door, a shot was fired near him and someone yelled, "halt."

About this time appellant was knocked to the floor by a blow from a pistol which fired simultaneously. While he was lying on the floor the man with the crutch pulled a pistol and came toward him. Appellant pulled a knife and slashed at the man's legs. The gun discharged, and the bullet went through the appellant's arm into his stomach. He crawled out the door and left in a van-truck for Mississippi.

Appellant denied stabbing the deceased and testified he could not say whether or not he had even seen him.

## I

Before the State completed its direct examination of Ronald Adams, appellant requested any statements made by this witness prior to the trial. Counsel insisted appellant was entitled to them under the "Jencks Rule."

The jury was excluded and during this hearing it was established that the witness had made a prior statement to the grand jury. The grand jury testimony involved the witness' ability to identify appellant as the assailant, and defense counsel argued there was an apparent discrepancy between the testimony at trial and that given previously to the grand jury.

Upon this basis the appellant made a request to inspect and use the transcription of the grand jury testimony for purposes of cross-examination. The State countered that the testimony was a "work product" of the district attorney's office and was not subject to the Jencks rule.

The trial court denied appellant's request and counsel argues this denial curtailed appellant's right to effective cross-examination.

The rule of *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, was rejected by our Supreme Court in *Sanders v. State*, 278 Ala. 453, 179 So.2d 35, and is not applicable. *Thigpen v. State*, 49 Ala.App. 233, 270 So.2d 666. Our appellate courts have held that the trial court is not put in error if it does not allow the inspection and use of grand jury notes until the State has used them to test recollection, to impeach or unless contradiction is shown. *Adams v. State*, 33 Ala. App. 136, 31 So.2d 99; *Bailey v. State*, 24 Ala.App. 339, 135 So. 407; *Williams v. State*, 32 Ala.App. 597, 28 So.2d 731.

In determining whether a contradiction was shown we find these instances referring to prior testimony by this witness before the grand jury:

Voir dire outside the jury's presence:

. . . . . .

"MR. BRUTKIEWICZ: Judge, he's asked the witness several questions. May I ask several questions relating to whether or not he told the members of the Grand Jury that he could not identify the person who stabbed the deceased?

"THE COURT: Well, we're getting into an area . . .

"MR. HOLLOWAY: I don't care if he asks him that. He can ask him that.

"THE COURT: I don't want to belabor this area now. I want to make a ruling on . . .

"MR. HOLLOWAY: Well, I am going to ask you to let Mr. Brutkiewicz ask him that.

"THE COURT: Well, go ahead and ask that question, now.

"WITNESS: I believe I told the Grand Jury that I didn't know if I could identify the man or not.

"MR. BRUTKIEWICZ: But you testified before the Grand Jury?

"WITNESS: I believe I told the Grand Jury I didn't know.

"MR. BRUTKIEWICZ: All right. I think that's exactly what we wanted to know . . ."

Cross-examination before the jury by Mr. Fairchild:

.       .       .       .       .       .

"Q. Now you say—haven't you previously testified before Friday under sworn testimony and said that you couldn't identify the person that attacked Charlie Lane?

"A. I said I believe that I didn't—I wasn't sure if I could identify the man or not.

"Q. You testified before another body; haven't you?

"A. Right.

"Q. And now today in this courtroom, you look at the Defendant and you don't know who he is, and you testify that he's the man; don't you?

"A. I recognize him now.

"Q. How do you recognize him?

"A. I recognize him as being the man.

"Q. Except—how does he differ except what he was that night (sic)?

"A. His hair is a little shorter, a good bit shorter, and he had a goatee, beard.

"Q. How about a jacket?

"A. Yeah; he had a jacket on.

"Q. What else is different?

"A. That's all I can see; that his hair's shorter, and he did have a goatee.

"Q. So you're testifying that the man that (sic) that night did the stabbing that you saw, you only saw him make one stab wound on Charlie Lane; is that right?

"A. Right."

.       .       .       .       .       .

"Q. Now the question, as testified earlier, that you didn't believe that—you say you testified earlier that you didn't believe that you could identify the assailant of Charlie Lane . . .

"A. No, sir; I said I testified before the Grand Jury that I didn't know if I could identify him.

"Q. You didn't know if you could identify him.

"A. I said I didn't know if I could identify him.

"Q. Okay. Now, of course, while we were striking the jury, then, they brought the Defendant out here and you saw him; didn't you?

"A. I haven't seen this man since that night; no, sir.

"Q. You didn't see him a while ago when you testified?

"A. A while ago.

"You didn't see him earlier in the trial sitting at the table here?

"A, No, sir; I have not seen that man until I walked in this courtroom right now.

"Q. Didn't you tell Mr. Willis in the back room that you could identify the man?

"A. Tell Mr. Willis?

"Q. Didn't you tell Mr. Willis that, earlier in the back room, that you could identify him?

"A. I told Mr. Willis I thought I probably could, but I didn't know. I'd have to see the man.

"Q. Then you were prepared to identify anybody they had here, then; weren't you?

"A. No, sir."

As can be seen from the above recitals, no contradiction was made to appear, and we hold the action of the court was proper. We also note, that following the court's initial denial of appellant's request for the grand jury testimony, defense counsel later made a motion for the trial court to review the grand jury notes in camera. As a result of this request the following morning the court directed that appellant be furnished a copy of Ronald Adams' testimony to the grand jury.

It is also apparent that defense counsel at no time afterwards attempted to call Ronald Adams for further cross-examination. Under the circumstances, we fail to see how the court could be put in error.

## II

■ During trial the defense called Captain Williams of the Mobile Police Department, and on cross-examination the State inquired whether appellant was advised of his constitutional rights. Captain Williams testified he was and began to answer questions involving the "Miranda rights." Defense counsel interposed an objection averring, "Unless all officers were present when a statement was made, it would not be admissible; and Sergeant Jordon is not here."

The objection was overruled, and now appellant complains the trial court was under a duty to withdraw the jury and determine the voluntariness issue outside of its presence. Defense counsel argues that the court was put on notice that the "confession's admissibility" was in dispute, and, although the jury was later excluded, the laying of the preliminary "Miranda" predicate in the jury's presence was prejudicial.

The U.S. Supreme Court has· never ruled that all voluntariness hearings must be held outside the presence of the jury regardless of the circumstances. *Pinto v. Pierce*, 389 U.S. 31, 88 S.Ct. 192, 19 L.Ed. 2d 31. In *State v. Wilbanks*, 289 Ala. 166, 266 So.2d 619, our Supreme Court recognized the propriety of excluding the jury in such matters, but ruled that the trial court was not under a duty to withdraw. the jury ex mero motu.

In the case before us no evidence on the content of the statement was ever presented. ·Only the threshold questions in the "Miranda litany" were gone into before the jury. It was only after these questions were answered that defense counsel requested the jury's exclusion, and the court immediately complied.

Our review of the record did not reflect any mention of a confession during these preliminary questions, and the only matter of this nature came from the defense when counsel objected about a statement.

Under the circumstances outlined and the foregoing decisions, we cannot see where the rights of the appellant were prejudiced.

## III

The refused charges were fairly and substantially covered in the court's oral charge and in the charges given at appellant's request. Title 7, Section 273, Code of Alabama Recompiled 1958.

We have examined the evidence presented and hold it was sufficient for the jury's consideration. The motion to exclude, and the motion for a new trial were properly overruled. *Young v. State*, 283 Ala. 676, 220 So.2d 843.

Our search of the record reveals no error.

Affirmed.

TYSON, HARRIS and BOOKOUT, JJ., and SIMMONS, Supernumerary Circuit Judge, concur.

CATES, P. J., not sitting.